[Crim. No. 5402. Second Dist., Div. Two. Nov. 8, 1955.]

THE PEOPLE, Respondent, v. BILL GOLDSTEIN, Appellant.

Jess Whitehill for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

ASHBURN, J. pro tem.*—Defendant Bill Goldstein was indicted for grand theft and conspiracy to commit grand theft. Also indicted and tried with him were Jay Rich and his wife, Betty Rich. Goldstein and Jay Rich were convicted. Betty Rich was acquitted. Defendant Goldstein made a motion for new trial which was denied. Probation was granted him and other proceedings in the case were suspended. He appeals from the order denying new trial and from the "verdict and final judgment." His is the only appeal with which we are now concerned. One Hyman Kean was also named as a conspirator, but was not indicted and became the prosecution's chief witness.

*Assigned by Chairman of Judicial Council.

The substance of the charge was that Kean and one Mark Price were engaged in the perpetration of fake automobile accidents and collecting fraudulent claims from insurance companies based thereon; that Kean arranged with the defendants Rich to participate in such a fraud; that defendant Goldstein joined the conspiracy; that a prearranged collision was had between Goldstein's truck, driven by him, and Rich's automobile which he was operating; that fraudulent claims for damages were presented by the Riches and the Keans to Goldstein's insurer, National Automobile and Casualty Insurance Company; that they resulted in payments by the insurance company of amounts totaling $2,750, part of which went to the defendant Goldstein.

Appellant's primary claim is that the evidence is insufficient to warrant a finding of conspiracy and in the absence thereof there could be no finding of the consummation of the grand theft. ■ The rule which must guide us in examining this contention is stated in *People* v. *Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911], as follows: "The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact. It is not whether guilt is established beyond a reasonable doubt. '. . . We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury." (See also *People* v. *Gutierrez,* 35 Cal.2d 721, 727 [221 P.2d 22]; *People* v. *Hatton,* 114 Cal.App.2d 195, 196 [249 P.2d 901].) We therefore adopt in our statement of facts that evidence which tends to support the judgment, rather than any conflicting testimony which was designed to prevent such a result. The following statement is based principally upon the testimony of Hyman Kean.

Kean, who had known Goldstein and Rich for years, went with Mark Price on or about July 27, 1953, to see the Riches, asked Jay Rich to go in on an accident which would be set up and said the money that was to be derived therefrom would be split three ways. Price told him he would have another party hit a car and the Riches would be participants in the accident; that Mr. and Mrs. Rich would occupy the automobile

that would be hit and they were to be injured. Reference was made to the insurance company and the splitting of the moneys received. Kean was to get a commission for introducing the Riches to Price. On or about August 14th there was another conversation between the same persons wherein it was said that after the accident the person that was to be hit would go to the hospital; that that would look better and if there was another party involved that would bring in more money. Price again indicated that Mr. Rich was to go to the hospital and Mrs. Rich was to take a part in the accident. The exact manner in which it was to be brought about was not stated in detail. Rich, the husband, said that if it was all right, if Kean thought it safe, he would take part in it, and he was assured that Price had made many cases before, that he had been at it for many years and had never had any trouble.

Shortly before August 15th, Kean and Price called at Goldstein's market to see him, but he was out. Soon thereafter Kean went alone to see Goldstein, who was busy waiting on customers in his market (at Fairfax and Oakwood in the city of Los Angeles), but nevertheless carried on a running conversation. Kean asked if he had insurance on his car. Defendant replied in the affirmative. He was then asked if he would go in on an accident with Kean and he made no definite reply, just listened. It was explained to him that there would be three persons included in the accident, that in order to get money he, Goldstein, would have to hit a car and if there were three people involved that the money would be split three ways. Asked if he had a car or a truck, defendant said he had both, and Kean suggested that the truck would be preferred. Shortly thereafter, Kean and Goldstein had another conversation at the market, and the latter was asked if he would come in on an accident. He said: "What is it; how would it take place?" and was told that several people would be involved and he would get one-third of the money. While the details of the proposed accident were not spelled out, Kean said he would have a party in the car and Goldstein would arrive from the back and hit the car lightly, not to hurt anybody. Goldstein made no audible commitment, but when asked if he would go in on the venture he nodded his head up and down, in an affirmative manner.

Shortly before the time arrived for perpetrating the collision Price, who had been managing the enterprise up to that date, got into an argument with Mrs. Kean, who ordered

him out of her home, and thereafter Mr. Kean took over the conduct of the venture. On the evening of August 19th the Riches went to the Kean residence and Mr. Rich was told by Kean about the argument with Price; also that he, Kean, had somebody other than Price's party in mind and would call him; that he knew a fellow that he had talked to a few days before who had nodded his head. He asked Rich if he would go through with the accident that night and was told that it was all right with Rich if it was all right with Kean and if he could get the proper party to do the hitting. Then Kean suggested to his wife that they go do some shopping. He had previously learned from defendant's brother, Joe Goldstein, that defendant customarily closed the market about 9 o'clock on alternate evenings and then drove south on Fairfax to Venice Boulevard on his way home. Kean on this occasion suggested that they go to Fairfax to shop and told Rich he would do the shopping while they were sitting in the car and he would call "this party" about the accident. Rich agreed. The four of them, Kean, Rich and the two wives, then drove in Rich's Oldsmobile to a place on Fairfax Avenue which was between Olympic Boulevard and Pico Street, and parked the car on the west side of the street facing south. This was opposite the Bagel Delicatessen and Restaurant, which was on the east side of the street. Kean then crossed the street, went into the Bagel, made a telephone call, using the number of Goldstein's market; when someone answered he asked to talk to Bill Goldstein, was told to hold the wire a minute; then Goldstein answered the call, Kean recognized his voice and said: "This is Hy. I am down at Pico and Fairfax." Also: "Bill, I am down here on Fairfax between—right across from the Bagel Delicatessen Restaurant and I want you to come down and I will be over there and, well, I am there right now, and I want you to come down there soon." And, "give me a clopp" which, according to the witness, was a Yiddish expression meaning "hit me." Goldstein said "Okay" and the fact that he understood the word "clopp" is evidenced by his prompt compliance with the request. In about 10 minutes Kean, who had come out of the restaurant and was in front of it on the east sidewalk, saw Goldstein's truck, which he recognized, coming southerly on Fairfax at a rate of about 20 to 25 miles an hour. Rich was at the wheel of the Oldsmobile parked at the west curb. When Kean saw the truck approaching he gave Rich a signal of some kind, Rich pulled out from

the curb into the path of the truck which hit his car in the left rear and according to Goldstein's later statement caused it to travel toward the west curb, ending up with the front end on the sidewalk. Kean testified that he had no recollection of having given a signal to Goldstein, although he definitely did give one to Rich. In a statement later given by Goldstein to the adjuster for the insurance company he said that as he approached the point of the collision he looked to the east briefly, then turned his head and found the Rich car directly in front of him. █ It is true in a criminal case as in civil actions that a statement against interest made by a party constitutes original and independent evidence of the facts so stated. (*People v. McGoldrick,* 107 Cal.App.2d 171, 174 [236 P.2d 597]; 19 Cal.Jur.2d § 397, p. 136.) It is fairly inferable that Goldstein saw the signal given to Rich, but regardless of that he knew what he was to do, he hit the intended car and at the place desired by Kean. Immediately after the impact Kean crossed the street and Goldstein got out of the truck and went to the Rich car. Mr. Rich was slumped down with his head over to the side near the door, groaning, moaning and seemed to be in pain. His wife testified that "he grabbed for his head and started to groan. . . . I didn't know where he had been hit or what had hit him. . . . His hands went up for his head and then he slumped over the wheel." Goldstein inquired if anyone was badly hurt, gave Kean his card, said he hoped everything was all right and drove away. No one called the police. Mr. Rich was taken first to the Kean house, then to his own home and then to the hospital. While at his own home Rich said to Kean: "Am I doing good as an actor?" and Kean said "Yes." Again, "How did I do? . . . You done very well." Rich was known to Kean to be an entertainer and actor by trade, and that was probably one reason he was selected as the principal victim of the alleged accident.

Claims for damages on the part of Mrs. Kean and the two Riches were placed in the hands of a firm of attorneys who, after making appropriate representations to the agents of the insurance company, effected a settlement resulting in the issuance of three insurance company checks. One for $375 was payable to Hyman Kean, Sally Kean and the firm of attorneys. They received it from Price, endorsed it and were given $250 cash in exchange. Another $375 check was payable to Jay Rich, Betty Rich and the attorneys, and the third one for $2,000 was payable to Jay Rich and the

attorneys. A few days after issuance of the checks Kean contacted Goldstein and, according to his original testimony, gave Goldstein $300 in a sealed envelope which he had obtained from Price, the same person who had delivered the $375 check and then the $250 to him. It later developed that the envelope was still sealed when delivered to defendant and hence Kean did not personally know that it contained $300. Incidentally, Goldstein never denied the receipt of the envelope or the specified amount of money.

Prior to the receipt of these checks, and on or about August 20th, Goldstein had reported the accident to his insurance agent, Max Green. He told him there was no liability and so Green sent him a report blank and told him to fill it in and deliver it to the insurance company. Later, defendant gave a statement to James W. Wylde, who was adjuster for the said company, and he therein said that while he was driving south on Fairfax "he happened to glance over at a building on the other side of the street for what purpose he couldn't recall, but he did, and when he glanced back to the street there was a car right in front of him and he put his foot on the brakes but he couldn't slam on the brakes and the front of his car hit the front of this other car knocking it up over the curbing." Also that there were two men and two ladies in the other car; gave the names to the adjuster and said he did not know any of the parties; that one man seemed to be injured but that the people in the car said they would not need an ambulance, they would take care of him themselves. Although defendant had told his broker that there was no liability it is apparent that this statement was couched in such terms as to give rise to an inference of liability, and, there being no other witnesses, it was calculated to leave the insurance company in a position where it could do nothing but settle any claims.

When defendant was arrested, Officer Kilpatrick asked him "regarding an accident with Mr. Kean" and defendant replied, "Kean, who is Kean—never heard of him." About 10 or 15 minutes later the following colloquy occurred: "Well, now, let's not kid each other about Mr. Kean. I know that you know him. You have known him for a long time; in fact, you are a friend of his, and he said, 'Well, yes, I do know him.'"

Appellant's argument of insufficiency of the evidence presents the familiar discussion of reliability of witnesses and reasonableness of inferences drawn by the jury. Much stress is laid upon the fact that the details of the accident were

not orally mapped out in advance and the participants did not know each other or know the identity of the other actors. This bears only upon the weight of the evidence, not its competency or sufficiency. ▮ "The gist of the crime under section 182 [Pen. Code] is the unlawful agreement between the conspirators to commit an offense prohibited by the statute accompanied by an overt act in pursuance thereof. An express agreement need not be proved. The agreement may be inferred from the declarations, acts and conduct of the alleged conspirators. . . . 'If in any manner the conspirators tacitly come to a mutual understanding to commit a crime, it is sufficient to constitute a conspiracy [citing cases]. It may result from the actions of the defendants in carrying out a common purpose to achieve an unlawful end [citing cases]. . . .' " (*People* v. *Daener,* 96 Cal.App.2d 827, 831 [216 P.2d 511].)

▮ ". . . [I]t is . . . settled that 'One who joins a conspiracy after its formation is liable as a conspirator just as are those who originated it' (11 Am.Jur. 548; 15 C.J.S. 1060; *Marino* v. *United States,* 91 F.2d 691, 696 [113 A.L.R. 975]), 'nor is it necessary that such conspirator should have seen the others, or have knowledge as to who all the members of the conspiracy are' (15 C.J.S. 1063; 11 Am.Jur. 548)." (*Anderson* v. *Superior Court,* 78 Cal.App.2d 22, 23 [177 P.2d 315].) The Supreme Court said in *People* v. *Buffum,* 40 Cal.2d 709, 725 [256 P.2d 317]: "It is, of course, unnecessary that each conspirator see the others or know who all the members of the conspiracy are. [Citing cases.] It is likewise unnecessary that each conspirator participate in the overt acts. [Citing cases.]"

Appellant further argues by way of claim of inadequate evidence that the testimony of the accomplice Kean was not corroborated to the extent required by law. Counsel relies upon the rule stated and applied in *People* v. *Morton,* 139 Cal. 719, 724 [73 P. 609], and *People* v. *Reingold,* 87 Cal. App.2d 382, 392 [197 P.2d 175], which are to the effect that the corroborating evidence must of itself tend directly and immediately to connect the defendant with the offense charged against him, and is not sufficient if it requires interpretation and direction from the accomplice's testimony to give it value. ▮ Although *People* v. *Griffin,* 98 Cal.App.2d 1, 27 [219 P.2d 519] (hearing in Supreme Court denied), cast some doubt upon the exclusiveness and universality of the

Morton test, the Supreme Court has reiterated that rule in the recent case of *People* v. *MacEwing*, 45 Cal.2d 218, 224 [288 P.2d 257], where it is said: "The corroborating evidence is sufficient if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the witness who must be corroborated is telling the truth. . . .

■ "The decisions applying section 1111, relating to accomplices, hold that the corroborative evidence required by that provision must be considered without the aid of the testimony which is to be corroborated and that it is not sufficient if it requires the interpretation and direction of such testimony in order to give it value. . . ." Referring to sections 1111 and 1108, Penal Code: "In our opinion both statutes must be construed to mean that corroboration is not adequate if it requires aid from the testimony of the person to be corroborated in order to connect the defendant with the commission of the offense charged." ■ But this does not require the corroboration to do more than substantially tend to connect the defendant with the commission of the offense in such manner as to satisfy the jury that the accomplice is telling the truth. ■ It does not require the testimony of the accomplice as to the corpus delicti, e.g. existence of the conspiracy, to be corroborated.

■ *People* v. *Trujillo,* 32 Cal.2d 105, 110 [194 P.2d 681]: "Such corroboration must create more than a suspicion of guilt, but is sufficient even though it 'be slight and, when standing by itself, entitled to but little consideration.' [Citing cases.] It is sufficient when the evidence offered as corroborative tends to connect a defendant with the commission of the crime in such a way as reasonably may satisfy a jury that the accomplice is telling the truth. ■ It is not necessary that the accomplice be corroborated as to every fact to which he testifies. If his testimony could be completely proven by other evidence, there would be no occasion to offer him as a witness. (*People* v. *Negra, supra* [208 Cal. 64 (280 P. 354)] ; *People* v. *Yeager, supra* [194 Cal. 452 (229 P. 40)].) For the same reason, it is not necessary that the independent evidence be sufficient to establish the defendant's guilt. The prosecution is not required to single out an isolated fact which in itself, unrelated to other proven facts, is considered to be sufficient corroboration. It is the combined and cumulative weight of the evidence furnished by nonaccomplice witnesses which supplies the test." (See

also *People* v. *Allen,* 104 Cal.App.2d 402, 413 [231 P.2d 896] ; *People* v. *Temple,* 102 Cal.App.2d 270, 277 [227 P.2d 500].)

██ *People* v. *Henderson,* 34 Cal.2d 340, 346 [209 P.2d 785], says : ''When as in the present record it is discovered that there is testimony aside from that of the accomplice which tends to connect the defendant with the commission of the crime, the function of the appellate court is performed.''

██ In *People* v. *Gallardo,* 41 Cal.2d 57, 62 [257 P.2d 29], an abortion case, the court said : ''Corroboration is sufficient if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the woman is telling the truth.*'' The footnote says : ''*Some of the cases state that the evidence must be 'inculpatory,' but this is used merely as another way of stating that it must tend to connect the defendant with the crime. [Citing cases.]'' At page 63 the court further says : ''It must create more than a suspicion, but it may be sufficient even though slight and entitled to but little consideration when standing by itself.†'' And the footnote to that page is this : ''†Although it has been said that corroboration is not sufficient where the circumstances are consistent with the innocence of the accused [citing cases], the more recent decisions have held that whether the corroborating evidence is as compatible with innocence as it is with guilt is a question of weight for the trier of fact [citing cases].'' *People* v. *McNamara,* 103 Cal.App.2d 729, 740 [230 P.2d 411], a conspiracy case, says : ''As we held before, the jury could reasonably find that the possession of the check protector and the circumstances relating thereto linked appellant sufficiently to the forgeries; the actual agreement, combination, may then be proved by the testimony of the accomplices.'' (To the same effect see *People* v. *Estes,* 99 Cal.App.2d 745, 747 [222 P.2d 454] ; *People* v. *Farrell,* 133 Cal.App.2d 427, 430 [284 P.2d 29].)

██ The corroboration may, of course, be furnished by defendant's own words or conduct. (*People* v. *Griffin, supra,* 98 Cal.App.2d 1, 25; *People* v. *Tinnin,* 136 Cal.App. 301, 305 [28 P.2d 951] ; *People* v. *King,* 40 Cal.App.2d 137, 141 [104 P.2d 521] ; *People* v. *Millmurth,* 77 Cal.App.2d 605, 612 [176 P.2d 102].)

██ Mrs. Rich testified that Kean was across the street at the time of the accident. She, having been acquitted, cannot be classified as an accomplice (*People* v. *Lawson,* 114 Cal.App.2d 217, 220 [249 P.2d 850]), and her testimony is

competent corroboration of the Kean story in this respect. That defendant's truck struck the car of the Riches is established by his own report to the broker and his statement to the adjuster for the insurance company. ▮▮▮ His initial report of no liability, followed by a statement to the adjuster containing facts indicating negligence, is indicative of an existing intention and effort on his part to build a false claim in favor of the Keans and the Riches. Indeed he gave Kean's name to the adjuster as one who was involved in the accident; said that there were two men and two women in the automobile which was struck. Also that he did not know any of the "other parties," which phrase, fairly interpreted, includes Kean. Of course defendant was acquainted with him (as he later admitted to the police), and his denial of the fact fairly raises the inference that he was assisting in establishing a claim in Kean's behalf. When he said there were two men and two women in the car, he must have known differently, and was apparently making an effort to include Kean, the fourth person, as one who could make a claim against his insurer. The fact that he may also have told Mr. Wylde, the adjuster, that there were two men and one woman in the car does not improve his situation any because that again places Kean in a place which he did not occupy. ▮▮▮ Evidence of consciousness of guilt is found in defendant's original denial to the police that he knew Kean or had ever heard of him, followed by the confession of such acquaintance.

▮▮▮ Lastly, the defendant did not himself testify. While this fact alone does not fill any hiatus in the proof of the prosecution and does not constitute the corroboration required by the statute, it is nevertheless persuasive, lending weight to evidence presented by the prosecution upon matters presumptively within defendant's knowledge, and which if untruly stated would normally be denied by him. (*People* v. *Ashley,* 42 Cal.2d 246, 268-269 [267 P.2d 271] ; *People* v. *Cox,* 102 Cal.App.2d 285, 287 [227 P.2d 290].) ▮▮▮ In *People* v. *Adamson,* 27 Cal.2d 478, 489-490 [165 P.2d 3], the Supreme Court summarized the matter thus: "The failure of the accused to testify becomes significant because of the presence of evidence that he might 'explain or . . . deny by his testimony' (Cal. Const., art. I, § 13), for it may be inferred that if he had an explanation he would have given it, or that if the evidence were false he would have denied it. (*State* v. *Grebe, supra* [17 Kan. 458] ; *Mooney* v. *Davis, supra,* 193 [75 Mich. 188 (42 N.W. 802, 13 Am.St.Rep.)] ; see Code Civ.

Proc., §§ 1963, subds. 5, 6, 2061, subds. 6, 7.) No such inference may be drawn, however, if it appears from the evidence that defendant has no knowledge of the facts with respect to which evidence has been admitted against him, for it is not within his 'power' (Code Civ. Proc., § 2061, subd. 6) to explain or deny such evidence. [Citing cases.] . . . The jury, however, is concerned with the scope and nature of the consideration that it may give defendant's failure to explain or deny incriminating evidence, and in the present case should have been instructed that the defendant's failure to deny or explain evidence presented against him does not create a presumption or warrant an inference of guilt, but should be considered only in relation to evidence that he fails to explain or deny; and that if it appears from the evidence that defendant could reasonably be expected to explain or deny evidence presented against him, the jury may consider his failure to do so as tending to indicate the truth of such evidence and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable." And in *People* v. *Ashley*, 42 Cal.2d 246, 268 [267 P.2d 271]: "A defendant's failure to take the stand 'to deny or explain evidence presented against him, when it is in his power to do so, may be considered by the jury as tending to indicate the truth of such evidence, and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable.' (*People* v. *Adamson*, 27 Cal.2d 478, 489 [165 P.2d 3].) . . . In criminal cases, after the prosecution has made a prima facie case, the failure of the defendant to testify is not affirmative evidence of any fact, and any inference that can, in the circumstance, be justly drawn therefrom is persuasive rather than probative, lending weight to the evidence presented by the prosecution." The testimony of the witness Kean related many matters which, if true, were within the knowledge of appellant, and if not true, normally would have been denied by him.

The corroboration was sufficient. There is no merit in the claim of insufficiency of the evidence to support the verdict.

 Appellant claims error in denial of his motion to strike certain testimony, but the brief does not comply with the applicable rule. (4 Cal.Jur.2d § 480, p. 311.) Counsel contents himself with setting forth certain transcript references, some 12 in number, and claims that error appears therein. It is his duty not only to point out the alleged error,

but to show exactly wherein the court's action is erroneous. Mere citation of the transcript pages and assertion that error there appears is insufficient. However, in this instance counsel affirmatively discloses the lack of merit in his contention for he says: "Each of the objections which were voiced by counsel was based upon the fact that said conversations were hearsay as to the appellant inasmuch as the *corpus delicti* had not been proved." ■ Of course the order of proof, especially in a conspiracy case, rests in the discretion of the trial judge, and the corpus delicti, as above shown, was adequately established in this instance.

Counsel next contends that there was error in receiving testimony of Officer Kilpatrick concerning defendant's denial of acquaintance with Kean, followed by an admission that he knew him. The argument is that this evidence was but part of an accusatory statement which was flatly denied by the defendant and therefore the entire statement was inadmissible. But it appears that the trial judge carefully excluded all of the accusatory statement except the question as to whether he knew Kean, and the later assertion that he was not telling the truth about that, with which assertion defendant agreed. ■ ■ The general proposition that when an accusatory statement is offered in evidence and it appears that the same is denied by the defendant the entire statement is inadmissible, is stated in *People* v. *Simmons,* 28 Cal.2d 699, 712 [172 P.2d 18], but the corollary to that rule is found in *People* v. *Megladdery,* 40 Cal.App.2d 748, 785 [106 P.2d 84]: "But where the conduct of the accused in the face of the accusation is of evidentiary importance, such as where false and evasive replies are made together with a denial, the conduct of the accused is admissible as showing a consciousness of guilt and the accusation is admissible to explain that conduct." ■ *People* v. *Brown,* 71 Cal.App.2d 669, 674 [163 P.2d 85]: "An accusation and a denial of guilt of an alleged offense are not admissible, but a denial followed by an admission of special facts or circumstances tending to prove guilt is relevant. ■ For instance, an accused may deny the commission of a criminal offense but subsequently acknowledge that he was at the scene of the crime. The latter statement would be admissible. . . ." To the same effect, see *People* v. *Morgan,* 87 Cal.App.2d 674, 681 [197 P.2d 413]; *People* v. *Moran,* 144 Cal. 48, 60 [77 P. 777]; *People* v. *Scott,* 84 Cal. App. 642, 649 [258 P. 638]; *People* v. *Wright,* 94 Cal.App.2d 70, 80 [210 P.2d 263].

Counsel for appellant also asserts that there was error in receiving exhibits consisting of the three checks, defendant's business card and defendant's statement given the adjuster. This contention is again built upon the assumption that no corpus delicti had been proved, and counsel concedes that "the validity of this objection must turn upon the argument heretofore advanced in support of appellant's contention that the verdict was insufficient as a matter of law." There was no error in the receipt of these documents in evidence.

Probation having been granted and the proceedings thereupon suspended, there was in fact no judgment, and this is true notwithstanding the requirement that defendant pay a fine and make certain restitution as conditions of probation (*People* v. *Wallach*, 8 Cal.App.2d 129, 133 [47 P.2d 1071] ; *In re Marquez*, 3 Cal.2d 625, 627 [45 P.2d 342] ).

An appeal may now be taken from a probation order (Pen. Code, § 1237), and it is established that where probation has been granted and no judgment entered an appeal which purports to be taken from the judgment may be treated as an appeal from the probation order. (*People* v. *McShane*, 126 Cal.App.2d Supp. 845 [272 P.2d 571] ; *People* v. *Camargo*, 130 Cal.App.2d 543, 545 [279 P.2d 194].) We have discussed all the points made in support of the appeal and as above shown find that they are not well taken.

The attempted appeal from the verdict is dismissed, as no such appeal lies.

The order granting probation and the order denying motion for new trial are affirmed.

McComb, Acting P. J., and Fox, J., concurred.