[Crim. No. 5946. Second Dist., Div. Three. Oct. 7, 1957.]

THE PEOPLE, Respondent, v. DANIEL RISSMAN,
Appellant.

George Bouchard and Robert J. Sullivan for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

VALLÉE, J.—Defendant was accused by indictment in two counts with violating section 653f of the Penal Code in that he "solicit[ed]" Casper Berger (Count I) and Albert Levin (Count III) "to offer and accept and join in the offer and acceptance of a bribe." He was also accused in two counts of grand theft. In a jury trial he was found guilty of the offenses charged in Counts I and III and not guilty of grand theft (Counts II and IV). Judgment was pronounced and defendant sentenced to state prison. The sentence was suspended and he was granted probation.

Defendant appeals from the order granting probation and from the order denying his motion for a new trial. He did not appeal from the judgment. ██ An appeal lies from an order granting probation only when the court suspends the imposition of the sentence and not when judgment is pronounced and the court suspends execution of the sentence. (Pen. Code, § 1237.) The appeal from the order granting

probation must be dismissed. A rather extended statement of the evidence is essential to a determination of the points made.

## Count I

In 1952 William Ferguson was business representative of the Bartenders Union. Dick Stovall was secretary-treasurer of the union. Ferguson had known Stovall for some time. In October or November 1952 Stovall told Ferguson he could obtain eight new liquor licenses, each purchaser would have to pay $5,500, everything above $2,500 would be divided between them, and cash would have to be paid for the license.

Later Jay Teale, who was working as a bartender at a bar on Pico Street in Los Angeles, told Ferguson he knew someone who might want a license. Ferguson went to the bar on Pico where he met the owner, Casper Berger, who was operating with a wine and beer license. Teale was present. Ferguson told Berger what the proposition was and, according to Ferguson, Berger agreed to buy a liquor license for $5,500. Ferguson then told Stovall about the arrangement he had made with Berger; and Stovall told Ferguson to tell Berger to go down and apply for a new license, which Ferguson did. Later Stovall told Ferguson that Berger had applied in the wrong name. Berger was known to Stovall as Don Rego. Ferguson testified Berger paid him $5,500 in cash less the regular fee for obtaining the license. Stovall was present. The $5,500 was placed in an envelope which Ferguson put in his pocket. Ferguson and Stovall then went to the Moose Lodge where a meeting was in progress. Defendant was at the meeting.

Stovall told Ferguson to give defendant the envelope containing the $5,500. Ferguson did so at the back end of the meeting hall while the meeting was in progress. Ferguson did not say anything to defendant and defendant said nothing to him. Ferguson testified there was no understanding between himself and defendant; he had no conversation with defendant "about splitting the difference between twenty-four or twenty-five hundred dollars and the purchase price."

Stovall gave Ferguson $300 for the part he had in the transaction. Ferguson was displeased, complained to Stovall, but got no satisfaction. Ferguson then saw defendant, told him how much Stovall had given him (Ferguson), that he did not think it was right, and asked him to intercede in his behalf. Defendant said he would speak to Stovall. Defendant

and Ferguson went to the union hall and defendant went into Stovall's office alone. Stovall gave Ferguson another $100. Defendant, Stovall, and Ferguson then had a conversation in which defendant said ''That the license cost more than was thought at first it would cost, that I [Ferguson] was receiving more than anyone else, that in the future any licenses that I sold I could pay four thousand and sell them for whatever I could get.''

Berger testified that in 1952 Ferguson and Stovall, who were together, told him the price of a license would be $6,000 less $262.50, the regular cost of a license for half a year; Stovall told him to go to the Board of Equalization, see Viggo Hansen, whose name Stovall wrote on a piece of paper, and make application for a new license. He did, saw Hansen, told him his name was Casper Berger, had a conversation with him, but did not file an application. . He told Stovall what he had done, that Hansen would not let him file. Berger also testified: ''I found out that Dick Stovall gave my name as Don Rego. He didn't know my legal name. So then he said, 'Well, wait until you hear from me. Everything will be all right.' And then I believe he called me up, perhaps a couple of days later, and told me to go back to the Board of Equalization and see Mr. Moran and fill out an application for a new license, everything will be all right''; he went back, saw Moran who told him to make out an application, that he should not have any trouble, if he did to see him (Moran) and he would take care of everything; he told Moran his name was Casper Berger; before he left the Board of Equalization he received a ''notice of intention'' to post on the window of his bar, which he did. While the notice was posted he paid Stovall and Ferguson $6,000 less the $262.50 he had paid for the license; he paid it in cash because both Stovall and Ferguson told him it had to be paid that way; 45 days later he received a new license.

Berger further testified: ''THE COURT: Either Mr. Ferguson or Mr. Stovall tell you at any time what they were going to do with this money that you gave them? THE WITNESS: When they took the money, they said they were taking it to the old man. They didn't mention any names. THE COURT: When they counted the money, they said what? THE WITNESS: Taking it to the old man to put in the safe. I didn't know who the old man was. They mentioned no names. Q. By MR. RITZI [District Attorney]: Did Mr. Stovall say an[y]thing about Mr. Viggo Hansen or Mr. Moran? A. Well,

they just told me to go up and everything will be taken care of; to make the application for the license. . . . Q. . . . Did Mr. Stovall say anything about Mr. Viggo Hansen or Mr. Moran? A. He said, 'Mr. Viggo Hansen is kind of funny in a way. He doesn't like to stick out his neck. He lets Moran do all the dirty work.' " Within an hour or two after he paid them the $5,737.60 Ferguson and Stovall returned and insisted the price was $6,000 net. After New Year's he paid Ferguson $262.50 additional in cash.

Berger testified he is not acquainted with defendant; did not know him in 1952; had not met him in the intervening time; and never heard his name mentioned in connection with the transaction.

### Count III

Albert Levin testified: In 1952 he owned a café in Los Angeles; he had a license to serve whisky, wine, and beer; he had known Paul Bershin about 10 years; in the latter part of 1952 Bershin asked him if he would like to buy a license; Bershin took him to see defendant; defendant told him he could get a new license for $3,500; he (Levin) did not have any place where he could use the license at the time; Bershin suggested he could use his (Bershin's) place of business; he saw defendant two or three days later when defendant told him the price would be $4,000, to go to the Board of Equalization, see Boyd Moran, and tell him a friend sent him; he went to the board, filled out an application, and saw Moran; Moran asked him "Who sent you?" He replied, "A friend"; a month or two later he received a license; he paid Bershin $4,000 in the presence of defendant; Bershin gave the money to defendant; there was no bar in the place for which the license was issued; he later sold the license for $6,000; he knew the fee for a license was $525.

Bershin testified he introduced Levin to defendant. Just prior to that, he and Levin had been to the Board of Equalization about obtaining a license. When he introduced Levin to defendant, he told defendant Levin "would be interested in one of them whiskey licenses." Defendant said a license would cost $3,500, that "There are licenses being issued but you and me both know that nobody is going to get a license for $525." The license was issued for his premises, which was an office on which he had a lease.

Bershin further testified that about the time of the Levin transaction he was in front of defendant's place with a Mr. Kinnard; defendant offered to secure a new license for Kin-

nard for $3,500; he did not receive any money for his services in either the Levin or Kinnard transaction. Kinnard, called by the People, testified he did not want a liquor license in 1952; he did not see defendant about a license; and defendant never at any time offered to get him a license.

Viggo Hansen testified that in 1952 he was the district liquor control administrator for the Board of Equalization. The statutory fee for issuing a general on-sale liquor license was $525 a year. If applications were made during the last six months of the year the fee was reduced one-half. One of his assistants was Boyd Moran, who died some time after 1952. He did not know Casper Berger. An investigation report with respect to Berger's application was introduced in evidence. It recites: "Approved, Boyd B. Moran, December 1st, 1952."

On February 15, 1955, defendant had a conversation with Ferguson and Stovall at the Mardi Gras Café in Los Angeles. Prior to going to the Mardi Gras Café Ferguson met two investigators from the attorney general's office. The investigators installed a small wire recorder, called a "minephone," on Ferguson's person. As he entered the café the recorder was turned on. After he left the café the recorder was turned off. He then contacted the investigators and they removed the recorder from his person. It was stipulated that a transcript of the recording could be read in evidence. In the conversation, Ferguson stated he was worried because two men from the attorney general's office called at his house. Parts of the recording are set out in the margin.[1] It is

---

[1] "Rissman: The first thing, there's no way in the world to show that you got anything or that you took anything or give anything because you didn't get no money from the bank. . . . Ferguson: One thing that worries me. Now wait. I don't remember and check me if I'm wrong—— Rissman: Yeah. Ferguson: At the time we got that—— Rissman: Berger? Ferguson: Berger, did I give him a receipt for the money we got? Rissman: I don't know whether you did or not, Bill. I don't believe—I don't—even if you did, I mean, this guy couldn't— he wouldn't tell. He's the kind that wouldn't tell the truth about it, because there's nothing they can do to him now, so—— Ferguson: You mean—— Stovall: Casper Berger."

"Rissman: Did you give any money to any public officials? Ferguson: Oh, I've never given any money to any officials. . . . Rissman: All right. Did you offer to bribe any then. Now then, did you offer them a bribe. I finally said to the—— Ferguson: I—Danny [defendant], that's all. . . . Rissman: I mean if you done anything wrong, why, if you, any license, you can either tell them yes or tell them no. Ferguson: Uh-huh. Rissman: Whatever you want to tell them, there's no way they can prove it. Understand? If you want to tell them yes, you can. Whatever you want to do. . . . Rissman: I bet, I bet when I—— when they come to me, I'm going to start to dummy up on them myself. See? And I

fairly inferable from the recording that defendant knew all about the activities of Ferguson and Stovall in connection with

---

mean that's my personal opinion. Ferguson: That's the reason I didn't go home last night. I had to find out your reaction. Rissman: I don't —I haven't seen a list of them in the newspapers. I knew I got one of the licenses, you know, but I don't know of any fast transaction there, and I don't give a darn about it. But I didn't pay no attention. I didn't pay any attention to—I had so many guys leave me packages and things. Half the time I never knew what they—even to consider, because the other you don't even get into the picture. The guy—— Stovall: Well, I'll tell you what his problem is. He's worried about paying income tax. You didn't show this on your income tax? Ferguson: Oh, I showed five hundred dollars on my income tax. Rissman: Well, that—— Ferguson: That's exactly what I got. . . . Rissman: I didn't get a quarter out of it. . . . By Mr. Rissman: Absolutely, I didn't, because I was never involved in it. And I don't even remember this transaction. You might have read something. I don't even remember you. . . . Ferguson: When I was dissatisfied with the amount of money I got, Danny [defendant]. I came down to see you, at the New Palace. Remember, I brought my brother-in-law down. He was a tall man. He worked, of course not here, but he worked for the FBI on interstate commerce. Rissman: At the New Palace? Ferguson: At the New Palace. I remember that. So I was dissatisfied with (blank) had given me. So I went down to see you and my brother-in-law was with me one time, and you told me—my brother-in-law who had no official connections whatsoever. And I went in your office and had a talk with you. Rissman: I don't have any memory of it."

"Rissman: Well, what I would do is—is go over there and you can take two positions: either one is you deny it or another way is say you did. You understand, either way it doesn't make any difference. Of course, in other words if a guy comes here and says, 'Here, I can get a license, nine thousand dollars.' I did get a license, you understand. And you can take two positions: yes, you did get one. Did you give any money for it? You understand. And if you're worried and you talk to them when those men come down, say, 'Yes.' Ferguson: No, I, I showed that—— Rissman: (Blank). Ferguson: Commission. Rissman: You don't have to. Ferguson: Commission, that's all. Rissman: Commission. Ferguson: That's right. Rissman: Then say, 'Yes.' Now, who, who did you get the money from, that money from. Let's say you say—— Ferguson: I never named the guy. Commission on sales is the way I listed that. Rissman: Yes, say, 'Yes.' All right, say, 'Yes.' and if they ask me about any of these things and I'll say, 'Well, I'll check.' You say your check was for—— (blank), couldn't get a license. He says 'If they want to donate some money to the campaign——' You don't know what campaign, but you understand, well, fine. So you got a donation to the campaign and you gave it, you gave it to him. You understand? Ferguson: Uh-huh. Rissman: Now did you get any commission out of it? Uh, if you want to say you got something, you can tell them and if you don't want to say you got something, you don't have to tell them. Ferguson: I don't want to tell them I got—— Rissman: Well, you don't have to say—you don't have to bring Dick [Stovall] in. You don't even have to bring me in. Ferguson: Well, why should I? Rissman: Yeah. Well, I know that. Ferguson: I only came to you men for advice, that's all. Rissman: No, no. Ferguson: I'm worried when I called you guys. Rissman: No, look, no, I, here, I can do anything that, that you want to, I mean, if you're going to mention—mention that. Stovall: Yes yes. Ferguson: After all, I am worried bad. Rissman: you can anybody. You can

the Berger and Levin transactions and that he participated therein. Ferguson said "At the time we got that—," and

either tell them anything—tell them the truth. Tell them you don't have any records. Understand? Ferguson: All right. Rissman: But if you want to do it that way, you can because actually you didn't get any money out of it, truthfully. Ferguson: Yeah, I got five hundred dollars. Rissman: All right, then truthfully, I never got five cents out of it. Truthfully I never seen (blank) out of this. Stovall: Say, 'Yes. Casper Weinberger [sic] asked me one day if I could get a license for ten thousand.' Rissman: I wouldn't, I wouldn't make a—— Stovall: I wouldn't either. Rissman: No. You say say, 'What are you talking about?' They will say, 'Well, so and so,' and say, 'Well, he just doesn't tell the truth.' See? Ferguson: Uh-huh. Stovall: So he asked me about it and I said I wouldn't buy it and I inquired from a fellow and he said, 'Well, if you want to donate your money to the campaign, have some money and want to donate money to the campaign, there's some——' What the heck, you know. Ferguson: Uh-huh. Stovall: Who got the money? A fellow by the name of Buzell. By Mr. Stovall again: Campaign money. Ferguson: Well, like I tell you, I got called at the house. I'll guarantee you I'm scared. Rissman: No, here's, here's, it all depends on who is scared. It's been explained. Here's the only thing that can happen. Bribery, if you attempted to bribe a public official or if you attempted to give Bill Bonelli or Pat Brown—— Ferguson: Heck, I don't even know Bonelli. Rissman: Well, I don't either myself. Or if you attempted to give money to those people, do you understand? Even if they don't accept it, it would be a bribe. Follow me? Ferguson: Yes. Rissman: Now even if they don't accept it, see, and if they did accept it, it would still be, but if you don't give any to them, then there's nothing wrong. Now as far as—you didn't steal any money off those people. You asked them if they wanted to make a—they asked you about the (blank) on this business and you said, well, you talked to somebody you encountered and, uh, a union leader there and he said, 'Yes,' he said, 'I can get one providing money is donated to the campaign and the place is qualified, and the place qualified,' but if it didn't qualify, you couldn't get it, see? Ferguson: Uh-huh. . . .''

"Rissman: Let me ask you. Do you know anybody at the Board, up at the State Board? Ferguson: No, I don't know any of them. Rissman: Go ahead and let me follow it out. Don't think I'm impertinent but have you given anybody up there any money? Ferguson: No. Rissman: Have you ever given any public official any money? Ferguson: No. Rissman: Well then, there's no bribery. Ferguson: Worried. Rissman: Now if they want to bring other people in there about it, memory, as far as I am concerned, it's very possible this could have happened but I, you see, they could get on along that line, 'What are you talking about. I don't remember.' Ferguson: Uh-huh. Rissman: The guy says, 'Well, he says he gave you some money there.' Say, 'Wait a minute. I remember that transaction. He asked me about this and that and I asked Buzell at the meeting whether any of those things were being issued, and he said, 'Well, we attempt to buy them if they qualify and they obey the law.' You understand? Ferguson: Uh-huh. Rissman: And he said, 'If you want to donate so much to the campaign, you can.' Well, donate. 'Just brought it over and that's all there was to it. Frankly, he didn't tell who it was.' And then you don't get a lot of people in a spot. Ferguson: Oh there's—let's face it, Danny. Rissman: See, that's why I don't worry. Here's the thing, I go through life, worrying about something, see, and after all, I got to make a living in this town, see? All of these people that put a finger on people, whether

defendant broke in and said ''Berger.'' Defendant said that when the investigators came to see him he was ''going to start

it's right or wrong, they will do it, understand? Ferguson, Yeah. Rissman: They will do it. But they will put a finger on them, they think, and when this is all over, is over, the next time, if they ever come to me, you understand. Ferguson: Yes. Rissman: I have—because I don't know anything. I'm not going to intentionally hurt everybody. Now all they can do is indict me, see? I have been indicted before, you understand, and usually go through anything. Now, I will tell you another thing. I'm not going up and lie. I'm not going to make a statement to them because if I don't want to tell them anything, I'm not going to tell it to them. You understand, you get me? If I do tell them anything, it's going to be the truth. That's why I'm saying, advising you: just tell them the truth, if you tell them anything. If you don't want to tell them anything, tell them nothing. Because if you lie to them, understand, and you tell them that you gave that money to Buzell and Buzell comes in and says that he didn't, you didn't give it to him—— Ferguson: He will. Rissman: For perjury, you understand. The chances are—look what—I have never seen, and all I got was a blast in the paper. They say as you get a little older you weaken. Ferguson: Yeah. Rissman: Don't worry. I wouldn't lie to them. I just went through this and I, and when they had me up, they, they wanted to know this and they wanted to know that, and I said, 'Gentlemen, what else do you want to know, what else, what else?' They said, 'Well, that will be all.' I said, 'Well, gentlemen, if you will give me something to refresh my memory, maybe I can tell you something.' They said, 'Give you something to refresh your memory.' So I walked out. And you understand. You have nothing to worry about.''
''Rissman: If you're going to tell them anything, tell them the truth. Ferguson: Uh-huh. Rissman: And if you don't tell them anything, then you stay put. Ferguson: I don't know anything. . . . Rissman: Because you ask somebody, you said, 'These are—I had a couple of transactions.' There's a lot of people that would put the finger on you who you think are your friends. Do you understand? Ferguson: Uh-huh. Rissman: All right. Then say, 'In what spots were they?' I mean, 'In what place was it that I paid them that dough?' Ferguson: Umh-humh. Rissman: And, 'You know the spot?' 'No, I don't.' Just tell them that. Ferguson: Uh-huh. Rissman: And if you're going to tell them the truth about it, go ahead. You understand? And you can say, 'There's some mistake. I don't recall that transaction.' Why, that's all there is to it. You understand? Ferguson: Umh-humh.''
''Ferguson: Well, I can go home. Rissman, Yeah, sure. Go ahead. Tell them the truth, that you went down to the union hall and they asked you whether you could get a license and you asked around there and Buzell said, 'Well, if the place, place and will qualify and you want to donate some money to the campaign, why you could do it.' But you don't remember the exact transaction. How are you supposed to remember what happened two or three years ago? 'I don't remember.' Ferguson: No, my only connection—— Rissman: That's the only way to do. You actually don't remember ninety per cent of the things that you're telling, telling me: that I went down to the union hall, that I gave you a bottle of rum. I must have been drunk that night or I thought you was a copper. Ferguson: No, we were in the office together. You knew better than that. Rissman: Well—— Ferguson: Nice seeing you. Rissman: Nice seeing you.''
After defendant left, this conversation took place between Ferguson and Stovall: ''Ferguson: Umh-humh. Danny [defendant], say he didn't met me, gosh. Stovall: Well, he admits it. Ferguson: We, we went up

to dummy up on them''; that Ferguson did not have to bring Stovall or him (defendant) in; he could do anything Ferguson and Stovall wanted him to; all they could do was indict him.

Defendant testified: He was in the liquor business in 1952. He has known Stovall for many years. He met Ferguson about 1952. He does not recall the incident of collecting money in the Moose Hall ''but it is very possible.'' ''Well, as I recall, if my memory serves me correct, there was a meeting going on and Mr. Stovall was the junior govenor [sic] of the lodge and I believe, if my memory serves me correctly, that Mr. Ferguson handed me an envelope and he says it's for Mr. Stovall. I can't be sure of that, and I put it in my pocket and after the meeting I presume I handed it back to Mr. Stovall.'' He did not get any of the money from the envelope. He had put numerous packages in his safe for Stovall. He did not know what the arrangement was between Ferguson and Stovall with respect to the sale of a liquor license. It is very possible that Ferguson went to him and told him he was

---

to the Moose Lodge that time—— Stovall: Oh, yeah, yeah. Ferguson: We gave him that envelope. Stovall: Sure, but he doesn't admit anything that way. He never knows who's going to—see? Ferguson: Yeah. Stovall: And that's what it was. You can, you can always throw it off on Bill. Ferguson: Umh-humh. . . . Stovall: ——or whether they did. But just say, 'He said they were planning to donate something to the campaign in such a way, six thousand or whatever it was, or five hundred, or whatever it was. Ferguson: Berger, I think he took around six thousand, didn't he? Less, less the license fee. Stovall: Yeah, I put around fifty seven hundred. I don't remember giving a receipt. I don't remember. No, I don't remember either. Ferguson: I didn't think I would be fool enough to give any man a receipt. Stovall: Well, a fellow can forget that. Now in the meantime, say, 'Yes.' If they say, 'Well, didn't you do business with Casper Berger,' or whatever his name is—— Ferguson: Umh-humh. Stovall: Say, 'You only advised Casper Berger,' only advised him, see what I mean? Ferguson: Umh-humh. Stovall: 'We didn't do no business.' Berger didn't give you no money. Berger didn't give you no nothing. Berger ain't going to give them the receipt. I'm sure of that. I'm sure of that. Ferguson: Yeah. Stovall: Because Berger would be afraid of that. Ferguson: Counting the money out there together. Stovall: Well, of course, he hasn't—— Ferguson: Yeah. Stovall: Berger won't tell no investigator, 'Here's a receipt.' I know the guy better than that. I only met him one time in my life, but I'm sure he wouldn't do that. Ferguson: No, I only met him a couple of times. . . . Ferguson: Well, who was the—who was the man we sent— who's the man we sent—— Stovall: He's dead, too. That's Moran. Ferguson: Moran. Stovall: He's dead, too. Ferguson: Oh, that was the guy at the Board of Equalization? Stovall: Yeah, he's dead, too. So you see what I mean. It's—— Ferguson, Umh. Stovall: Everybody's getting out. Ferguson: Umh-humh. Stovall: So he's, he's gone, been dead, oh, near a year and a half ago. Ferguson: Well, the only thing is, I don't know a thing. Isn't that right? Stovall: No, that's what I would do. Ferguson: All right. Stovall: That's what I would do; that's what I would do.''

not getting his "cut." It could be possible Ferguson told him the nature of the deal he had with Stovall. He went to see Stovall with Ferguson and told Stovall "one of his business agents was very angry and might cause him a great deal of trouble." Defendant denied he told Ferguson that he (defendant) was not making much money out of those licenses; testified he "never was in those licenses"; denied ever receiving any money from Levin or Bershin for the purpose of securing a license for Levin. He was aware Moran and Hansen were with the Board of Equalization but did not know either of them personally.

Defendant further testified he talked to Ferguson and Stovall in the Mardi Gras about 5 or 10 minutes; he believed Ferguson said he was very worried about some license transactions he had with Stovall; they said, 'Well, we picked up money from a dozen different places, licenses," he asked them for what purpose and they explained it to him and he said, "I'll tell you one thing. If I was you, if you do have to go up, don't perjure yourself. Either get up and tell the truth or leave it go." Defendant denied saying in that conversation that if any investigators contacted him he was going "to dummy up on them." He also denied making various other statements in the conversation which it appears from the recording he did make.

Every person who solicits another to offer or join in the offer of a bribe is guilty of a public offense; such offense must be proved by the testimony of two witnesses, or of one witness and corroborating circumstances. (Pen. Code, § 653f.)

Defendant first asserts the corpus delicti was not established as to either count charging solicitation of a bribe. He says the corpus delicti consists of the asking, the intent, and the contemplated overt act. The People say the first two elements comprise the corpus delicti. The People are right. Defendant asserts proof of the specific intent and of the contemplated overt act are wanting. ■ When any person solicits another to offer or join in the offer of a bribe, the solicitor has committed the offense described in section 653f. (*People* v. *Woodward,* 136 Cal.App. 149, 151-152 [28 P.2d 36].)

■ The gist of the offense is the solicitation to offer or join in the offer of a bribe, and not the commission of bribery. (*People* v. *Humphrey,* 27 Cal.App.2d 631, 637 [81 P.2d 588]; *People* v. *Haley,* 102 Cal.App.2d 159, 164-165 [227 P.2d 48].)

■ The intent may be gathered from the surrounding circumstances. (*People* v. *Megladdery,* 40 Cal.App.2d 748, 784

[106 P.2d 84].) ■ A contemplated overt act is not an essential element of the offense denounced by section 653f. The offense "is complete when the solicitation is made, and it is immaterial that the object of the solicitation is never consummated, or that no steps are taken toward its consummation." (*People* v. *Burt,* 45 Cal.2d 311, 314 [288 P.2d 503, 51 A.L.R.2d 948]; anno: 51 A.L.R.2d 953, 956.) The intent of defendant to solicit another to offer and to join in the offer of a bribe to obtain liquor licenses as charged in Counts I and III was clearly established.

An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (Pen. Code, § 1111.) Manifestly Ferguson and Bershin were accomplices.[2] Defendant claims Berger and Levin also were accomplices. He argues they knowingly participated and joined in the solicitations; that they were coconspirators. He then claims the provision of section 653f that the offense must be proved by the testimony of two witnesses, or of one witness and corroborating circumstances, was not satisfied as to either count. He argues that an accomplice is not a witness within the meaning of section 653f. He argues further that there was no corroboration of the testimony of the accomplices.

A witness is a person whose declaration under oath is received as evidence for any purpose. (Code Civ. Proc., § 1878.) Section 1880 of the Code of Civil Procedure specifies the persons who cannot be witnesses; an accomplice is not among them. The term "accomplice" is ordinarily used in connection with a witness in a criminal case, a witness whose testimony, by the familiar rule of evidence, requires corroboration in order to convict. (Burdick, The Law of Crime, 305, § 226.) ■ An accomplice is a competent witness; and accomplices are competent witnesses for and against each other. ■ The witness' complicity in the offense does not render him incompetent to testify; it only goes to his credibility. (58 Am.Jur. 112, § 156.) The question whether a person is an accomplice arises only when such person becomes a witness. ■ An accomplice is a witness within the meaning of section 653f. (*Cf. People* v. *Humphrey,* 27 Cal.App.2d 631, 640 [81 P.2d 588].)

We need not stop to inquire whether Berger and Levin

---

[2] Stovall did not testify.

were accomplices.[3] If it be assumed that Berger and Levin were accomplices, there is sufficient corroboration of the testimony of Ferguson and Berger as to Count I and of the testimony of Bershin and Levin as to Count III.

 The corroborating evidence is sufficient if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the trier of fact that the witness who must be corroborated is telling the truth.

 The corroborating evidence must be considered without the aid of the testimony which is to be corroborated, and it is not sufficient if it requires the interpretation and direction of such testimony in order to give it value. (*People* v. *Mac-Ewing,* 45 Cal.2d 218, 224-225 [288 P.2d 257]; *People* v. *Goldstein,* 136 Cal.App.2d 778, 787-790 [289 P.2d 581].) " 'The evidence tending to connect a defendant with the commission of the crime may be slight and, when standing by itself, entitled to but little consideration. [Citation.] The law does not require that the evidence necessary to corroborate the testimony of an accomplice shall tend to establish the precise facts testified to by the accomplice; and strong corroborative testimony is not necessary to support a judgment of conviction founded on the testimony of an accomplice. Even though circumstantial and slight, the evidence is, nevertheless, sufficient if it tends to connect the accused with the commission of the offense. [Citations.] The defendant's own statements and admissions, made in connection with other testimony, may afford corroboratory proof sufficient to sustain a verdict. [Citations.] It is not necessary that the corroborating evidence should go so far as to establish by itself, and without the aid of the testimony of an accomplice, that the defendant committed the offense charged.' (*People* v. *Negra* (1929), 208 Cal. 64, 69-70 [280 P. 354].)" (*People* v. *Harper,* 25 Cal.2d 862, 876-877 [156 P.2d 249].)

 A defendant's admissions, active and passive, and his declarations constitute corroboration. (*People* v. *Wilson,* 25

[3]For cases holding the solicitee is not an accomplice see *People* v. *Baskins,* 72 Cal.App.2d 728, 731 [165 P.2d 510]; *People* v. *Haley,* 102 Cal.App.2d 159, 165 [227 P.2d 48]. Also see *People* v. *Powell,* 50 Cal. App. 436, 443 [195 P. 456]; *People* v. *Brown,* 61 Cal.App. 748, 751 [216 P. 58]; *People* v. *Layman,* 117 Cal.App. 476, 478 [4 P.2d 244]; *People* v. *Nickell,* 22 Cal.App.2d 117, 124 [70 P.2d 659]; *People* v. *Montgomery,* 47 Cal.App.2d 1, 10 [117 P.2d 437].

For a case indicating that the solicitee may under some circumstances be an accomplice, see *People* v. *Wayne,* 41 Cal.2d 814, 824-828 [264 P.2d 547]. Also see *People* v. *Gondelman,* 253 App. Div. 924 [2 N.Y.S.2d 405].

Cal.2d 341, 347 [153 P.2d 720] ; *People* v. *Goldstein,* 136 Cal. App.2d 778, 789 [289 P.2d 581].) Inferences from defendant's testimony may suffice to corroborate an accomplice. (*People* v. *Wilson, supra; People* v. *Griffin,* 98 Cal.App. 2d 1, 25 [219 P.2d 519].) The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration. (*People* v. *Henderson,* 34 Cal.2d 340, 343 [209 P.2d 785].) The evidence of inculpatory participation need not be direct nor extend to every fact and detail. It may be circumstantial and is sufficient, even though slight, if it tends to connect the defendant with the commission of the crime. (*People* v. *Wayne,* 41 Cal.2d 814, 822 [264 P.2d 547].) The weight to be given corroborative evidence is a question for the trier of fact to determine. (*People* v. *McNamara,* 103 Cal.App.2d 729, 738 [230 P.2d 411].)

We are of the opinion the corroborative evidence meets the test stated in *People* v. *MacEwing, supra,* 45 Cal.2d 218, 222-225. Defendant's association with Ferguson and Stovall at the time in question, his peculiar explanation of his relations and dealings with them, his meeting with Stovall on Ferguson's behalf, the tape recording, his denial of statements made in the meeting at the Mardi Gras, his lack of memory and evasiveness in testifying,—all tend to connect him with the commission of the solicitation offenses. (*People* v. *Burt,* 45 Cal.2d 311, 315 [288 P.2d 503, 51 A.L.R.2d 948] ; *People* v. *Gray,* 52 Cal.App.2d 620 [127 P.2d 72] ; *People* v. *Woodward,* 136 Cal.App. 149, 152-153 [28 P.2d 36].)

The court denied defendant's motion for a new trial. He asserts error. It is evident from what we have said that the court did not abuse its discretion in denying the motion. (*People* v. *McGarry,* 42 Cal.2d 429, 432-433 [267 P.2d 254].)

The appeal from the order granting defendant probation is dismissed. The order denying a new trial is affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 4, 1957.