[Crim. No. 7463. Second Dist., Div. Two. Aug. 22, 1961.]

THE PEOPLE, Appellant, v. IRVING A. OLF et al.,
Respondents.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, William B. McKesson, District Attorney, Harry Wood and Robert J. Lord, Deputy District Attorneys, for Appellant.

Burke Mathes, Murray M. Chotiner and James O. Warner for Respondents.

McMURRAY, J. pro tem.*—The People appeal from an order granting respondents' motions to set aside an indictment pursuant to the provisions of Penal Code section 995.

The three respondents here, Irving A. Olf, Sidney N. Floersheim and Sanford Fineman, were charged in the first count of the indictment with the crime of conspiracy in that they conspired to cheat and defraud, to obtain money and property by false pretenses, to violate Penal Code, section 115, and to violate Corporations Code, section 3020, subdivision (b). In support of this count six overt acts were alleged, five of such acts being violations of Corporations Code, section 3020, subdivision (b), and the sixth being the holding of a certain conversation.

The second count of the indictment charged only respondent Olf with a violation of Penal Code, section 115, in that he did on October 17, 1958, "knowingly procure and offer to be filed, registered and recorded, a false instrument, to wit, a verified application for a permit to issue securities, said application being an instrument which, if genuine, might be filed, registered and recorded under the laws of the State of California," and the remaining 14 counts of the indictment charged respondents Olf and Floersheim with various separate grand thefts committed on dates ranging from November 17, 1957, to December 5, 1958.

Respondent Olf was the president and general manager of Coast Thrift and Loan, herein referred to as "Coast," a California corporation doing business in Los Angeles County as an industrial loan company. This company secured funds from the public by issuing certificates in the form of savings pass books and used these funds largely to buy conditional sales contracts accompanied by promissory notes. Among the customers of Coast were Pacific Appliance Company, herein called "Pacific," which was operated by respondent Fineman and California Merchants Investment Corporation, herein called "CMI," of which respondent Floersheim was the president.

■■■ Upon a motion to set aside an indictment under Penal Code, section 995, it is incumbent on the trial court to sufficiently scrutinize the transcript of the proceedings before the grand jury to determine whether there is some legally admissible evidence to support the indictment. ■■ As is said in *Lorenson* v. *Superior Court*, 35 Cal.2d 49 at p. 55 [216 P.2d

---

*Assigned by Chairman of Judicial Council.

859] : "An indictment is but an accusation, presented by the grand jury to a competent court, charging a person with a public offense. (Pen. Code, § 917; *Greenberg* v. *Superior Court,* 19 Cal.2d 319 [121 P.2d 713] . . . .)"

The grand jury by the provisions of Penal Code, section 939.8, is enjoined as follows: "The grand jury shall find an indictment when all the evidence before it, taken together, if unexplained or uncontradicted, would, in its judgment, warrant a conviction by a trial jury."

■ The mere fact that some incompetent evidence is received by a grand jury does not authorize the setting aside of an indictment if there is evidence otherwise sufficient to support the indictment. (*People* v. *Nathanson,* 134 Cal. App.2d 43 [284 P.2d 975].) ■ In other words, where there is a total absence of evidence to support a necessary element of the crime charged, the indictment will be held to be invalid for that reason. (*McFarland* v. *Superior Court,* 88 Cal.App.2d 153 [198 P.2d 318].) ■ The indictment may be set aside where there is no probable cause to believe the defendant guilty of the crime charged, but in this respect it must be remembered that "[p]robable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused. [Citation.] An indictment will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." (*Bompensiero* v. *Superior Court,* 44 Cal.2d 178, 183 [281 P.2d 250].) ■ On such a motion a court may not substitute its judgment as to the weight of the evidence for that of the grand jury. (*Lorenson* v. *Superior Court, supra,* 35 Cal.2d 49.)

With these rules in mind, a study of the record before this court reveals that although some hearsay evidence may have been received by the grand jury, there is sufficient evidence to support its indictment as to all of the counts excepting Count 2 thereof. The respondents vigorously contend that there is no admissible evidence to support the indictment.

The record submitted to this court is not a model for future grand jury proceedings nor motions under section 995 of the Penal Code. The transcript of the proceedings before the grand jury is apparently a photostatic copy of the original transcript, which has in places been heavily underlined and marred by marks made with a dark pencil, in many cases

almost obliterating the words originally reproduced in type-writing.

The burden which is placed upon a trial court under Penal Code, section 995, is one which requires the court to so scrutinize the questioned record before it, whether it be an information or an indictment, as to ascertain whether there is any admissible evidence which supports the action of the magistrate or the grand jury, as the case may be. Where there is a heavy burden upon busy criminal trial courts, it is apparent that many of such motions can be determined by the district attorney directing the court's attention to specific, concise testimony which supports the charge. However, where, as here, the court determines that an information must be set aside, it is incumbent upon the court to read the entire transcript of the proceedings before the grand jury to determine whether or not there is any evidence which will support that body's determination that a crime has been committed, always bearing in mind the fact that only probable cause must appear. The fact that the trial judge feels, perhaps correctly, that the evidence in the grand jury transcript will not result in an ultimate conviction of the defendants can have no bearing upon his legal responsibility to uphold an indictment if, as is said in *Bompensiero* v. *Superior Court, supra,* at pages 183-184: ". . . there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it."

The respondents contend that much of the evidence before the grand jury was inadmissible as being hearsay, and that certain documentary evidence was not only hearsay as to certain of the respondents, but was also objectionable since it was merely a photo copy of the original hearsay documents and, therefore, was also inadmissible.

At the grand jury proceedings, several bankers testified as to various bank records held by them which were photostatic copies of original sheets, deposit slips and checks in the custody of the particular bank. Objection is made that there is no foundation showing that these were business records, and that, in any event, they were hearsay. This contention is without merit since the documents from the files of the respective banks were admissible under the Business Records statute, Code of Civil Procedure, sections 1953e and 1953f. It has been said that: "The purpose of this act [Code Civ. Proc., § 1953f] is to enlarge the exception to the

hearsay rule, to eliminate the necessity of calling as a witness each person who had personal knowledge of the facts recorded, and to substitute the record of the transaction or event.'' (*Cole* v. *Ames*, 155 Cal.App.2d 8, 17 [317 P.2d 662].)

Here there was testimony before the grand jury identifying the signatures on the various documents as the signatures of the respondents, and the other records produced, as they were, by officers of the several banks would certainly appear to justify the inference that these were business records and not some sort of private memoranda kept by the witnesses. At the trial of the action, there is no doubt that a better foundation would be laid for the introduction of such exhibits than was laid at the proceedings before the grand jury, but the failure to establish a technical foundation for their admission before that body does not render such exhibits inadmissible. Copies of checks and records of CMI were also introduced, supported by testimony that they had been furnished by Floersheim to one of the witnesses who was a corporation examiner for the Division of Corporations of the State of California. Many of these checks bore the endorsement of respondent Olf on the reverse side and thus would not be subject to the objection that they were hearsay as to him.

The objection that the photostatic copies were not admissible does not appear to be well founded since they appear to be admissible under the Uniform Photographic Copies of Business and Public Records as Evidence Act. (Code Civ. Proc., §§ 1953i and 1953k.) Also certain photostatic copies of the records of a savings and loan association were admissible under the provision of section 1953i of the Code of Civil Procedure in connection with an escrow for the purchase of certain property by respondent Floersheim. Furthermore, the Corporations Commissioner had examined the books and records of Coast as part of his regular business routine, and had prepared a schedule showing the delinquent accounts of Coast prepared by the commissioner in his official capacity as liquidator. This schedule also comes within the Business Record statute (Code Civ. Proc., §§ 1953e and 1953f; see also *Fox* v. *San Francisco Unified School Dist.*, 111 Cal. App.2d 885, 891, 892 [245 P.2d 603]; *People* v. *Gorgol*, 122 Cal.App.2d 281, 295, 298 [265 P.2d 69].) An application filed by respondent Olf for a permit to operate as an industrial loan company was also admissible. (*People* v. *Kuder*, 98 Cal.App. 206, 213 [276 P. 578].)

Although the photostatic copies of some of the checks did not show the perforations evidencing their payment, there was testimony that the originals were so perforated and that all had been paid.

The first count of the indictment charges the three respondents with the crime of conspiracy. The gist of the criminal offense of conspiracy is the conspiracy which is single although the object may be to commit several crimes or to engage in a continued course of criminal activity. Conspiracy may result from acts of the parties from which intent is shown to carry out a common purpose to violate the law (*People* v. *Allen,* 104 Cal.App.2d 402 [231 P.2d 896]), and that common design is the essence of conspiracy and the crime may be committed whether the parties comprehend its entire scope, whether they act separately or together, by the same or different means known or unknown to some of them, but constantly leading to the same unlawful result (*People* v. *Hess,* 104 Cal.App.2d 642 [234 P.2d 65]), and there need be no showing of direct association between members of a conspiracy (*People* v. *Means,* 179 Cal.App.2d 72, 80 [3 Cal.Rptr. 591]).

 Both Pacific and CMI sold a number of conditional sales contracts to Coast. These contracts were discounted and a dealers' reserve was deducted from the face amount of each contract purchased by Coast. All of the contracts so purchased by Coast were "with recourse" against the seller. It appears from the transcript that most of the contracts so purchased by Coast were with poor credit risks. Before the grand jury one of the witnesses who had been credit manager for Pacific and had later worked for Coast, paraphrased one of respondent Fineman's advertisements in a newspaper as stating: "If you are turned down for credit, if you have no credit, if you are a bum credit, come to us because we will sell you anyway." Many of the purchasers of items from Pacific or CMI defaulted without ever making a single payment.

When certain accounts became delinquent, a list thereof would be prepared and submitted by Coast to CMI or Pacific, as the case might be, and a demand made for payment. CMI or Pacific would thereupon make payments on accounts sold to Coast and these payments would bring the accounts so paid to an apparently current status. It appears that in judging whether or not an account was delinquent, it was considered

current unless it was 90 days delinquent. Many of these payments so made by CMI or Pacific were in fact fictitious, new contracts being delivered to Coast instead of money, which new contracts were usually of the same poor quality as those already in default, and were of such poor quality as credit risks that employees of Coast, at Olf's direction, ceased to make any credit investigation of the solvency or reliability of the purchasers. Despite the fact that the quality of these contracts was so known, they were treated as solvent credits and credited as payment against the delinquent accounts as though money or solvent credits had been in fact furnished.

There was testimony before the grand jury that Olf and Fineman both were aware of the poor quality of paper furnished by Pacific to Coast, and that despite this, and despite a statement by Fineman to Olf that Olf must continue to accept Pacific paper, or that they would both go down together, Coast and Fineman continued to deal in the manner above stated until it became necessary for the Corporations Commissioner to act as conservator of Coast with the result that actual delinquencies reached the sum of $207,166.54 out of a total number of contracts purchased in the face value of $539,826.71. The CMI account also showed constantly growing delinquencies until the total accounts reached the amount of $595,499.10, of which $325,618.83 were delinquent ninety days or more.

The respondents urge that all this course of dealing shows is bad business judgment. This is an argument which might well be addressed to a trial jury, but remembering the function of a court on a motion to set aside an indictment, it here lacks persuasion. It would appear that such facts give sufficient foundation for the grand jury to properly draw an inference that a conspiracy did in fact exist, and it would appear to be within the grand jury's province to decide whether the course of conduct of respondents here was indicative of bad business judgment or of a criminal conspiracy to cheat and defraud Coast and its shareholders.

There is testimony by certain accountants that the entries in Coast books of payments when the valueless contracts were furnished by Pacific and CMI were in fact sufficient to keep those accounts from being delinquent. There is no magic to an accounting entry. It may only be made to reflect a transaction and if in that transaction no thing of value is received, an accounting entry which states that value was received does not make it so.

The language of the indictment may perhaps be inartistic in that Count 1 thereof does not name any victim or class of victim. This objection voiced by respondent Olf would seem to be answered by Penal Code, section 956, which provides: "When an offense involves the commission of, or an attempt to commit a private injury, and is described with sufficient certainty in other respects to identify the act, an erroneous allegation as to the person injured, or intended to be injured, or of the place where the offense was committed, or of the property involved in its commission, is not material."

Certainly, if an erroneous designation of a victim does not invalidate the pleadings there is no reason why the omission of the name of the victim should have such a result. As regards the theft counts, the evidence supporting the indictment is sufficient. Perhaps upon demurrer a trial court might sustain the same and allow amendment of the accusatory pleading, but we are here concerned with an order setting aside an indictment and not with a demurrer.

From a reading of the entire transcript, it appears that the grand jury had before it sufficient competent evidence to support the charge of conspiracy. ▋ It has been said that to prove conspiracy "[t]he existence of the agreement may be shown by circumstantial evidence. (*People* v. *Bucchierre*, 57 Cal.App.2d 153, 163 [134 P.2d 505]; *People* v. *Ragone*, 84 Cal.App.2d 476, 480 [191 P.2d 126].) ▋ It is not essential that the overt acts be criminal. (*People* v. *Gordon*, 71 Cal.App.2d 606, 628 [163 P.2d 110].) Nevertheless, if such innocent acts are done as a step toward the furtherance of the conspiracy they are sufficient. (*People* v. *Gilbert*, 26 Cal.App.2d 1, 23 [78 P.2d 770].) ▋ Further, the overt act may be accomplished by only one of the conspirators and yet be sufficient, for the members of the conspiracy are bound by all acts of all members done in furtherance of the agreed plot. (*People* v. *Creeks*, 170 Cal. 368, 374 [149 P. 821]; *People* v. *Benenato*, 77 Cal.App.2d 350, 356 [175 P.2d 296].) ▋ Once the conspiracy is established all evidence of the substantive crimes become admissible against all participants, even though the other conspirators were not present. (*People* v. *Temple*, 15 Cal. App.2d 336, 339 [59 P.2d 417]; *People* v. *Gordon, supra*, p. 627.)" (*People* v. *Pierce*, 110 Cal.App.2d 598, 610 [243 P.2d 585].)

▋ The fact is that here there was no showing that Fineman and Floersheim ever met each other, or dealt with

each other, but such a showing is not required. (*Anderson* v. *Superior Court*, 78 Cal.App.2d 22, 24 [177 P.2d 315].) Furthermore, there is no showing that any understanding between Olf and Floersheim was ever known to Fineman or participated in by him, nor that any understanding between Olf and Fineman was ever known to Floersheim, or participated in by him. However, a common purpose is shown to exist, namely, to loot Coast of funds, thereby cheating and defrauding the shareholders of Coast and obtaining money from Coast by false pretenses. This most assuredly establishes a common purpose of conspiracy and the existence of a mutual understanding might well be inferred by the jury from the fact that employees of Pacific and CMI changed employment to Coast.

A question might arise as to the availability of a conspiracy charge as to Floersheim and Fineman conspiring to violate section 3020, subdivision (b) of the Corporations Code which reads: "(b) Every director, officer, agent, or shareholder of any corporation, domestic or foreign, who, with intent to defraud, destroys, alters, mutilates, or falsifies any of the books, papers, writings, or securities belonging to the corporation, or makes or concurs in making any false entries, or omits or concurs in omitting to make any material entry in any book of accounts or other record or document kept by the corporation is guilty of a public offense."

It is apparent that this offense can be committed only by an officer of the corporation, but Olf was such an officer, and by his reciprocal dealings with Floersheim and Fineman, they each became aiders and abettors of the commission of the offense by Olf and could therefore be charged as principals. (*People* v. *Young*, 132 Cal.App. 770 [23 P.2d 524].)

The overt acts alleged to support this conspiracy count are, as Overt Act Number 1, that on August 16, 1957, Olf and Fineman violated section 3020, subdivision (b) of the Corporations Code and Overt Act Number 4 alleged that on September 26, 1958, Olf and Fineman again violated said section. Proof of the first overt act is supported by a Coast check in the sum of $3,000, and supporting papers which show a Coast check for $3,000 to the order of Pacific, a schedule of contracts, a voucher apparently prepared at the time of the drawing of the check, an adding machine tape and four ledger cards representing a particular transaction, whereby it appears that such check was delivered to Pacific, endorsed by Fineman, as Sanford Allen, and returned to Coast and entered

as a payment against delinquent accounts of many months' standing.

Overt Act Number 4 is another transaction between Olf and Fineman whereby the course of dealing between Coast and Pacific is shown and new bad paper is accepted and shown as a credit against already delinquent bad paper. Knowledge on the part of Fineman and Olf as to the nature of this paper is supported by statements of Fineman to Olf that "[y]ou've got to buy it because you have to keep my doors open so I can be in business and I can service the sets. If you put me out of business, I won't service the sets. You will have the repossession. They will drive you crazy"; and, also, "[w]ell, I have to get some money to operate"; also "if I go down, you go down, too."

These conversations also support overt act alleged as Number 6 in the information.

Overt Act Numbers 2 and 3 support the course of dealing hereinabove set forth between Coast and CMI where new bad paper, which soon became delinquent, was furnished by Floersheim as payment for old bad paper already delinquent.

Overt Act Number 5 is grounded upon a theft which is also the subject of a grand theft charge in Count Number 7 of the indictment wherein Floersheim enabled Olf to pocket money properly belonging to Coast.

The charge set forth in Count 2 of the indictment is that Olf wilfully violated section 115 of the Penal Code which provides that: "Offering False or Forged Instruments to Be Filed of Record. Every person who knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed, or registered, or recorded under any law of this state or of the United States, is guilty of felony." This count is attacked by respondent Olf as being invalid since the application for the permit filed with the Corporations Commissioner is not an "instrument" within the meaning of the section. With commendable frankness, the attorney general admits that there are cases which support respondent Olf's contention in this respect.

People v. Fraser, 23 Cal.App. 82 states at page 84 [137 P. 276]: "It must therefore be presumed that the word 'instrument' as used in section 115 of the Penal Code, is limited in its meaning and application to that class of instruments invariably referred to throughout our statutes. [Citations.]

"Generally the term 'instrument' as applied to documents necessarily imports a paper writing; but every paper writing is not necessarily an instrument within the settled statutory meaning of the term. With reference to writings the term 'instrument' as employed in our statutes has been defined to mean an agreement expressed in writing, signed, and delivered by one person to another, transferring the title to or creating a lien on real property, or giving a right to a debt or duty." (See also *Jennings* v. *American President Lines,* 61 Cal.App. 2d 417 [143 P.2d 349, 144 P.2d 54]; *Rich* v. *Ervin,* 86 Cal. App.2d 386 [194 P.2d 809], and *People* v. *Wood,* 161 Cal. App.2d 24 [325 P.2d 1014].)

The attorney general suggests that such an interpretation of the statute is overly rigid and that it would be proper for this court to find that the filing of the application for the permit here was in fact a violation of Penal Code, section 115. This argument, while it might well be persuasive in the absence of previously decided cases, would, under the existing law and the above cited decisions, appear to be one that should be addressed to the Legislature rather than the judiciary. When a code section has received such interpretation for such a considerable period of time, namely, since the decision of the *Fraser* case in 1913, it would appear to be unwise for a court to change such interpretation in order to subject one to a possible criminal liability.

The remaining counts of the indictment charge various grand thefts as to Olf and Floersheim. Each of these counts, except one, appears in the transcript to have consisted of a transaction whereby Olf, on behalf of Coast, issued a check to CMI, which check was deposited to the account of CMI at its bank. Thereafter, usually in the same amount and on the same, or approximately the same, date, CMI issued its check to Olf. Olf then deposited such CMI check to his personal account as was shown by his deposit slips and the ledger sheet of his banks. The signature of Olf was identified on each of the Coast checks as was his handwriting on the deposit slips. Each of the various deposits and withdrawals was testified to by an officer of the bank having custody of the deposit slips and bank ledger sheets. While this course of transaction might perhaps be merely bad business judgment, it might also be theft. The grand jury so determined.

Floersheim, although not shown to have received any of the money represented in these grand theft charges, cer-

tainly participated in these transactions to a sufficient degree as to render him liable as a principal as an aider and abettor.

 One count of grand theft is grounded upon evidence at the grand jury investigation which shows that a Coast check was issued to CMI as a refund for payment from reserve to that corporation; that that reserve came from CMI and would have to be paid back to it; that a witness who was a clerk for Olf had been requested by him to pay it to Mr. Floersheim, but that she made the check payable to CMI and a short time later the check was returned to her by Olf, endorsed by CMI, by S. Floersheim, and she was told to deposit it and issue an exchange check payable to Floersheim. The first check was deposited to the bank account of Coast and the second check was issued to Floersheim personally. Records of CMI's bank show that this check was issued to purchase a cashier's check to the order of a savings and loan association; an officer of that savings and loan company identified a photostat as a true and exact copy of escrow instructions in which there was a sale of a house to Floersheim and his wife, wherein a cashier's check in the amount of $1,895 was received. This was the identical amount as was the original check to CMI, and also the identical amount as was the second check to Floersheim, which was supported by savings and loan company's entry kept by it in the usual course of business, and such records showed that the sum was represented by the very cashier's check purchased by Floersheim.

This count of grand theft is amply supported by the evidence and shows a theft by Floersheim from Coast with the assistance of Olf.

The orders setting aside the indictment, insofar as they affect Counts 1 and 3 through 16 are reversed; insofar as the order affects Count 2 of the indictment, it is affirmed.

Fox, P. J., and Ashburn, J., concurred.

A petition for a rehearing was denied September 15, 1961, and the petition of respondents Irving A. Olf and Sidney N. Floersheim for a hearing by the Supreme Court was denied October 17, 1961.