[Crim. No. 8466. Second Dist., Div. Two. June 28, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. ARTHUR LLOYD SINGER, Defendant and Appellant.

Joseph W. Fairfield and Ethelyn F. Black for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Calvin W. Torrance, Deputy Attorney General, for Plaintiff and Respondent.

ASHBURN, J.—Convicted of two counts of abortion (Pen. Code, § 274) committed March 10, 1961, upon Marilyn Carrico and Judy Breazeale, respectively, defendant appeals from the judgment and attempts to appeal from certain orders hereinafter mentioned. His codefendant Lynne Holzman pleaded guilty and testified for the prosecution.

Viewing the evidence most favorably to respondents, as we must (*People* v. *Daugherty*, 40 Cal.2d 876, 885 [256 P.2d 911] ; *People* v. *Sweeney*, 55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049] ), the story is as follows.

Miss Marilyn Carrico, suspecting herself to be pregnant because she had missed a period, consulted Dr. Jack Weintraub who gave her an internal examination and talked with her, as a result of which she believed herself pregnant. By telephone she arranged a meeting with appellant's codefendant Lynne Holzman, who was a stranger to her.

Having had no menstrual period for two months Miss Judy Breazeale thought herself pregnant and visited Dr. John Witt in late January or early February 1961; told him she had missed her period but had had the flu and thought it due to that. The doctor merely gave her some shots. She met Mrs. Holzman at the Witt office where the latter worked as receptionist,

Appellant's opening brief says that these two unmarried women (Marilyn and Judy) "apprehensive of their condition desired to abort their embarrassment" and "separately they engaged the services of Lynne Holzman for this purpose"; that she said "that she would be of help for a price." "There is evidence in the record that Mrs. Holzman advised Miss Carrico and Miss Breazeale that she would have them aborted and that the price would be $575.00." Pursuant to previous arrangement each of the two women arrived at the corner of Wilshire and LaBrea in Los Angeles on the evening of March 10, 1961, about 6 p.m. Soon Mrs. Holzman arrived in an automobile and took both of them to a restaurant for dinner. She had made an arrangement with Dr. Singer to bring them to his office and this she did after dinner. Judy had $275 and Marilyn $300 and they gave the money to defendant Holzman before they reached Dr. Singer's office. Mrs. Holzman handed it to him as soon as they entered the office and he gave her $60 for bringing the girls to him. Both were introduced when they entered.

Judy was taken into a back room while the other women remained in the reception room. She there saw an examining table and some instruments. Appellant asked how many periods she had missed and was told three. Appellant had her undress and placed her on the table. She could not see what he was doing but felt something cold, like metal, in her private parts. Soon she had some cramps and felt slight pain. Appellant appeared to be working in the area of her private parts. He gave her a roll of gauze and told her to unwrap it, saying that he was going to insert it in her. She then had the sensation of having something inside her. She dressed and wore a sanitary napkin when she left the room. Appellant had given her some pills and said to take one that night and one the next day. When she left appellant's office she was in a great deal of pain and felt something inside her private parts. In all, this took one-half hour.

Then Marilyn went to the back room. Appellant asked if she was pregnant and she said yes. In response to another inquiry she said that her doctor believed her to be so. (Dr. Weintraub also testified to that effect.) She then disrobed and got onto the table. Appellant said he was going to insert gauze in her. She felt something in the area of her private parts and felt pain in them. Though she could not see what he was doing, defendant appeared to be working on her. When she told appellant it hurt, he said, "What did

you expect?'' She put on a sanitary napkin, dressed and returned to the reception room. There appellant gave her his card, handed a piece of paper to Mrs. Holzman and said it was a prescription which she should have filled and that she should give Marilyn half; also if Marilyn needed him she should call in the morning. Mrs. Holzman asked appellant how long Marilyn and Judy should leave the tube in and he said to leave it for 48 hours and then take it out.

As the women started to leave the office, Police Officers Mitchell, Bates and Hill appeared and arrested Dr. Singer and Mrs. Holzman.

On the next morning Marilyn went to Dr. Weintraub again and thence to San Vicente Hospital near LaBrea where she remained for five to seven days.

On the second day she was there appellant came to see her and asked how she felt. He put an envelope on a tray near her bed; she asked what it was and he said money. ''What for?'' ''Well, because if you are not in town when this comes to trial it will not come to trial without a witness.'' ''I can't take it.'' ''Well then, consider it as payment toward your doctor bill, your hospital bill.'' After appellant left Marilyn opened the envelope and saw that it contained $450. She later turned it over to Officer Mitchell.

After she entered the hospital Dr. Weintraub found a gauze pack in her vagina and a urinary catheter placed in her cervix, the mouth of the womb. He removed both pack and catheter. On March 14 he performed a dilation and curettement on the patient, a procedure whereby the mouth of the womb is opened and the abnormal contents of the uterus are emptied; this he did because the patient was ''septic infective'' and ''there was a possibility of some retention of tissue.'' His diagnosis, etc., was ''incomplete AB'' meaning an incomplete state of abortion. The patient had continued bleeding. '' [T]he fact that the catheter was inserted in all likelihood induced the state of abortion.'' Dr. Weintraub reported the matter to the police department and they took possession of the catheter.

Judy Breazeale felt something inside her private parts after she left appellant's office; she never saw it but she had felt something being done to her. On the next Tuesday she went to a hospital in Glendale where Dr. Erickson made a pelvic examination and found the uterus ''enlarged approximately two and one half months size of gestation or pregnancy.'' In the vaginal vault he found ''a large one-inch

roll of gauze, bloody, stained dark brown." He also discovered the tip of a rubber tube protruding from the "cervical os." "I gripped this with a tenaculum and removed it, and out came a total length rubber catheter." It was turned over to the police. Dr. Erickson expressed the opinion that Judy was in a state of incomplete abortion or miscarriage and that the catheter could contribute toward the miscarriage. "Q. Do you know of any other medical reason to place a catheter inside of a pregnant uterus? A. I know of none."

After her release from the hospital, Judy received a telephone call from a person who identified himself as the appellant; in answer to an inquiry she said she was fine and was then asked how much it would be worth to her to leave town for a while. She said she could not leave town, was busy and could not talk, and thus ended the conversation.

Sergeant F. L. Mitchell of the Los Angeles police was one of the investigating and arresting officers. He had had previous long experience on the abortion detail. He, with Lieutenant Brown, Sergeant Hill and Officer Bates, having been previously apprised of what was going to happen, were stationed at an observation point when the three women arrived separately at Wilshire and LaBrea. This was about 6 p.m. Defendant Holzman arrived in an automobile, and motioned the others to the end of the building as she drove around to the back. There they had a conversation in the car, Mrs. Holzman and Marilyn went to a telephone booth where the former made a telephone call, stopping and talking with Marilyn from time to time. The three women then drove to a restaurant on West Pico Street and had dinner. The police followed them to that spot and thence to 10743 LaBrea Avenue, an office having Dr. Singer's name on the door; they entered at 8 p.m. The police waited outside until 9:05 when appellant and the three women appeared in the doorway and the women got into Mrs. Holzman's car. Sergeant Mitchell and Lieutenant Brown pushed their way into appellant's office and Sergeant Hill and Officer Bates conversed with the women at the Holzman automobile. Upon inquiry appellant identified himself as Dr. Singer; Mitchell identified himself and placed the doctor under arrest. Sergeant Mitchell and appellant went to a rear room which had an examining table with stirrup attachments and into another room where two sterilizers were in operation. Asked what he had done to the two girls who had just left the office appellant said he had put a rubber tube in the uterus but "had not aborted

them.'' '' 'Well, you put the tubes in the uterus of these girls to cause a miscarriage eventually, didn't you?' And he stated, 'Yes. But,' he said, 'they have not miscarried as yet, they are still pregnant.' '' The officer saw in one of the sterilizers two red rubber catheter tubes similar to those later received in evidence. There was also in the sterilizer a piece of heavy gauge wire; asked if he had used it as an insert so he could guide the catheter appellant said yes. Appellant was required to empty his pockets and thus produced a large roll of bills amounting to $1,489 by actual count made by the police. He said he had received $300 from one of the girls and $250 from the other and that those sums were part of the money the officers had just counted. He also said he had given codefendant Holzman $30 ''for each of the girls that she had brought to him.'' In his wallet was a paper which bore the name Lynne Holzman and a telephone number which he said was the residence telephone of the Lynne Holzman who had just left the office. It was in her handwriting and received in evidence as Exhibit 2.

Appellant's main arguments go to his ultimate point that the evidence was insufficient to support the verdicts. In view of the evidence above summarized it immediately becomes apparent that this end could be reached only by indirection and such has been appellant's approach. In other words, he argues that the evidence is insufficient because incompetent and because it does not show a complete miscarriage which counsel asserts to be essential to a violation of the statute.[1]

The language of the section refutes this last mentioned contention—''with intent thereby to procure the miscarriage of such woman.'' The correct rule is stated in 1 California Jurisprudence 2d, section 11, page 159: ''The gist of the crime is not the actual consummation of an abortion as such, but is the performing of any of the acts prohibited by Penal Code § 274 with intent to procure a miscarriage, and it is immaterial whether or not a miscarriage is produced.''

*People* v. *Pollum*, 97 Cal.App.2d 173, 177 [217 P.2d 463]:

---

[1]Penal Code section 274: ''Every person who provides, supplies, or administers to any woman, or procures any woman to take any medicine, drug, or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life, is punishable by imprisonment in the state prison not less than two nor more than five years.''

"And it is not a necessary element of the offense that pregnancy should exist or that a miscarriage be accomplished."

Accord: *People* v. *Rhoades,* 93 Cal.App.2d 448, 450. [209 P.2d 33]; *People* v. *Simon,* 21 Cal.App. 88, 90-91 [131 P. 102]; *People* v. *Berger,* 131 Cal.App.2d 127, 129 [280 P.2d 136]; *People* v. *Ramsey,* 83 Cal.App.2d 707, 717 [189 P.2d 802].

Appellant argues that Mrs. Holzman was an accomplice and her testimony was not adequately corroborated as required by Penal Code sections 1108 and 1111.[2]

■ *People* v. *Gallardo,* 41 Cal.2d 57 [257 P.2d 29] involved conviction upon 12 counts of abortion, one of conspiracy and three of attempted abortion. After quoting section 1108, Penal Code, the court said at page 63: "A woman who has submitted to an abortion is not an accomplice of the persons charged with procuring or conspiring to procure the miscarriage. [Citations.] The testimony of any one of the twelve women can be corroborated by that of a witness who was an accomplice, for example Gallardo or Chelini, and the testimony of the accomplice can be corroborated by that of any one of the women. [Citations.] Moreover, any one of the women upon whom an abortion was performed can act as a corroborating witness with respect to matters which she may have observed that are relevant to another count charging the performance of an abortion upon a different woman." Applied to the instant case this means that Marilyn and Judy could be corroborated, as they were, by accomplice Lynne Holzman; also that she could be corroborated by each of them, especially as the same technique of abortion was used upon both. ■ The corroboration does not have to go to the fact of corpus delicti, merely to a connection of defendant with the commission of the crime as established by other evidence, and it is sufficient "even

_____

[2]Penal Code section 1108: "Upon a trial for procuring or attempting to procure an abortion, or aiding or assisting therein, . . . the defendant cannot be convicted upon the testimony of the woman upon or with whom the offense was committed, unless she is corroborated by other evidence."

Penal Code section 1111: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

though slight and entitled to but little consideration when standing by itself." *Gallardo, supra,* at pages 62-63: "Corroboration is sufficient if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the woman is telling the truth. [Citations.] It has been held that the corroborative evidence need not by itself establish that the crime was committed or show all the elements thereof, but it must relate to some act or fact which is an element of the offense. [Citations.] It must create more than a suspicion, but it may be sufficient even though slight and entitled to but little consideration when standing by itself. [Citations.]"

Witkin on California Evidence, section 489 at page 545: "Sufficient corroboration may be furnished by the defendant's own testimony, his admissions or confessions, or his silence in the face of an accusatory statement. The entire conduct of the parties, their relationship, acts, and conduct during and after the crime, may be considered. The corroboration need not extend to all elements of the offense, nor to every detail in the testimony of the accomplice. It need not be strong; it is sufficient if it tends in some slight degree to implicate the defendant. It need not be direct; circumstantial evidence is sufficient if the connection of the defendant with the crime may be reasonably inferred therefrom. In brief, the corroborating evidence is sufficient if it connects the defendant with the commission of the crime in such a way as reasonably to satisfy the fact-finding body that the accomplice is telling the truth."

*People* v. *Goldstein,* 136 Cal.App.2d 778, 788-789 [289 P.2d 581]: " '. . . It is not necessary that the accomplice be corroborated as to every fact to which he testifies. If his testimony could be completely proven by other evidence, there would be no occasion to offer him as a witness. [Citations.] For the same reason, it is not necessary that the independent evidence be sufficient to establish the defendant's guilt. The prosecution is not required to single out an isolated fact which in itself, unrelated to other proven facts, is considered to be sufficient corroboration. It is the combined and cumulative weight of the evidence furnished by nonaccomplice witnesses which supplies the test.' [Citations.]"

Under these authorities it cannot be gainsaid that the testimony of each of the abortees was corroborated by that of

the accomplice Mrs. Holzman, by appellant's own voluntary admissions made to the police, by the observations made by the police and disclosed by their testimony, or that each abortee was not competently corroborated by the other. Nor can it be held that the volume and content of the corroboration were not sufficient.

■ The rule that corroboration is not sufficient if it requires aid from the testimony of the accomplice in order to connect defendant with the commission of the offense (*People* v. *MacEwing,* 45 Cal.2d 218, 224 [288 P.2d 257]; *People* v. *Buono,* 191 Cal.App.2d 203, 217 [12 Cal.Rptr. 604]; *People* v. *Goldstein, supra,* 136 Cal.App.2d 778, 788) is not applicable here. There is other evidence, such as his own admissions, which connects appellant with the crime.

■ Still aiming at insufficiency of the evidence counsel urges unlawful search and seizure. Arresting officers had no search or arrest warrant. The argument is that they had no probable cause for arrest or a search and that evidence which is identifiable as the fruit of that evil tree must be rejected. This applies to the paper (Exhibit 2) with the name and telephone number of codefendant Holzman, which was in defendant's possession, and to the admissions made by him at the time of his arrest. No other documents or items of evidence that had been seized were placed in evidence.

It seems that the statements of appellant well might be treated as the fruits of the unlawful search if there was one. (See, *People* v. *Dixon,* 46 Cal.2d 456, 458 [296 P.2d 557]; *People* v. *Mills,* 148 Cal.App.2d 392, 402-403 [306 P.2d 1005]; *People* v. *Macias,* 180 Cal.App.2d 193, 197-199 [4 Cal.Rptr. 256].) For present purposes we may so assume. But the record shows that the police had reasonable cause clearly established. The court so held after hearing evidence on the subject in the absence of the jury.

Sergeant Mitchell testified that he then knew of a report made by Sergeant Diaz of the homicide division on January 15, 1961, to the effect that arrangements were being made for this appellant to perform an abortion upon one Sue Shapiro, 14 or 15 years old; but that Lieutenant Brown and Sergeant LePage had informed him that the abortion did not take place because the girl could not raise the $300. Sergeant Mitchell also said he had anonymous information that a Dr. Singer, who was employed part time at an emergency hospital on Santa Monica Boulevard, "was doing abortions"; that Lieutenant Brown in the afternoon of March 10

received information from a police officer assigned to undercover investigation that he had become acquainted with Judy Breazeale and her friends and had learned from this source that Judy and a girl named Marilyn Carrico were to be picked up in front of the Huddle Restaurant at Wilshire and LaBrea around 6 p.m. that evening and taken by one Lynne Holzman to a doctor's office where they were to be aborted.

Lieutenant Brown on January 17, 1961, had made a report which Sergeant Mitchell had and which said concerning the Sue Shapiro abortion that Sue and another had shown Mrs. Lommen a card that had been given them by Lynne Holzman and " 'Mrs. Lommen had Bea call DUnkirk 7-2101 and tell Lynne Holzman that she wanted to talk to Dr. Singer and get a description of the technique he would use on her sister. Lommen listened on the extension. Holzman told Bea she would have Dr. Singer call her back. He did immediately. Bea asked him to describe what he was going to do to Sue, and he said she would be in his office for only about ten minutes, and that 48 hours later the fetus would——' This says 'd-i-s-s-o-l-u-e.' I don't know what Lt. Brown meant by that word. That this was a new technique. Singer told her as soon as they got the money and decided to have the abortion to call him, he was ready."

Concerning the Carrico and Breazeale abortions Mitchell and associates had been told that these girls would be picked up by Lynne Holzman. So they were on hand and saw and followed their movements as above set forth. The witness Mitchell further said that when he saw the girls emerging from Dr. Singer's office "my opinion was and my feeling was that they had been aborted, and based upon my knowledge that Dr. Singer was an M.D., I assumed he had performed a D & C or curett[e]ment, and this is why I looked for curettes upon searching Dr. Singer's office."

On cross-examination Mitchell testified that he did not know the name of the informer of March 10 and had never worked with him before, but "would consider him reliable . . . because he is a police officer . . . the information came through police channels . . . [he] knew he was a trained Los Angeles policeman." "Q. Incidentally, did this particular informer mention the name of Dr. Singer to you? A. I don't know, sir. Lt. Brown took this information. It was strictly confidential, because were this officer to be con-

nected with this arrest and his identity revealed, it could have jeopardized his life and the success of his investigation, and it was given to Lt. Brown in strict confidence.''

In arguing that the police relied upon an anonymous informer whose reliability had not been established counsel for appellant forget or ignore a line of cases beginning with *Willson* v. *Superior Court,* 46 Cal.2d 291 [294 P.2d 36], which establish that such information is not to be rejected when it is shown that reliance upon it was reasonable and that the information is authenticated sufficiently to justify a search based upon it where facts observed by the officers square with information furnished by the informer in such manner as to show circumstantially that he was telling the truth and that a felony was about to be committed or had been committed. Other cases to the same effect are *People* v. *Prewitt,* 52 Cal.2d 330, 337 [341 P.2d 1]; *People* v. *Prewitt,* 184 Cal.App.2d 602, 604 [7 Cal.Rptr. 691]; *People* v. *Hood,* 150 Cal.App.2d 197, 201 [309 P.2d 856]; *People* v. *Ames,* 151 Cal.App.2d 714, 722 [312 P.2d 111]; *People* v. *Diggs,* 161 Cal.App.2d 167, 171 [326 P.2d 194]; *People* v. *Gonzales,* 186 Cal.App.2d 79, 82 [8 Cal.Rptr. 704]; *People* v. *Rayson,* 197 Cal.App.2d 33, 38 [17 Cal.Rptr. 243]. There was no unlawful search or seizure here.

As so often happens, appellant as a witness denied most of the damaging evidence of the prosecution. His story was that the two young women came to him for examination to determine whether they were pregnant; that he confined himself to such examination and was unable to determine whether they were in that conditioon. He did not receive from his codefendant any money or give her part of it for bringing them; the large amount of money, $1,400, in his wallet was explained by the alleged fact that he was expecting to make a loan that very evening to his friend, Stanley Gerstein, and had that afternoon tried to pay to Dempsey-Tegeler & Co. the sum of $725 that he owed them. The jury obviously rejected this and other testimony of appellant and that rules it out of consideration upon this appeal. The evidence is amply sufficient to support the verdict.

Under the caption ''Regarding the Preliminary Hearing'' appellant presents an argument that appellant's motion to set aside the information under section 995, Penal Code, was unlawfully denied. The record does not include the text of the motion,—merely minute order references to the making and denial of such a motion, hence we do not

know what the grounds were. But, as the statute specifies only two grounds, namely, that defendant had not been legally committed by a magistrate and that he had been committed without reasonable or probable cause, we shall assume, as counsel have done, that absence of a showing of reasonable or probable cause was the assigned basis of the motion.

■ Certain basic considerations are to be kept in mind. "Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused." (*Bompensiero* v. *Superior Court,* 44 Cal.2d 178, 183 [281 P.2d 250].) In *De Mond* v. *Superior Court,* 57 Cal.2d 340, 344 [19 Cal.Rptr. 313, 368 P.2d 865], the court quoted *Bompensiero*: " 'An indictment will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it' " and further said: "The same rule applies to an information.". ■ At page 345: "The credibility of witnesses at the preliminary examination, of course, is a question of fact within the province of the committing magistrate to determine, and neither the superior court nor an appellate court may substitute its judgment as to such question for that of the magistrate. [Citations.] ■ The magistrate is not bound to believe even the uncontradicted testimony of a particular witness, especially where the statements are self-serving and the magistrate has reason to believe that other testimony of the witness is untruthful."

*People* v. *Crosby,* 58 Cal.2d 713, 730 [25 Cal.Rptr. 847, 375 P.2d 839]: "The choice between conflicting factual inferences, however, is (so far as is material in the matter now at bench) for the grand jury to determine. If, as here, there is some competent evidence to support that determination, a court will not substitute its judgment for that of the grand jury. (*Lorenson* v. *Superior Court* (1950) 35 Cal.2d 49, 55 [1] [216 P.2d 859].)"

See also *People* v. *Olf,* 195 Cal.App.2d 97, 102 [15 Cal. Rptr. 390]; *People* v. *Reed,* 202 Cal.App.2d 575, 581 [20 Cal.Rptr. 911]; and *People* v. *Ketchel,* 59 Cal.2d 503, 531-532 [30 Cal.Rptr. 538, 381 P.2d 394].

■ Appellant's first assault upon the preliminary hearing raises the claim that "no corpus delicti was ever established that an abortion had been committed." The unsoundness of the assumption that the corpus delicti consists of

"an abortion . . . committed" has been shown *supra*. Counsel's argument that the things done in order to procure a miscarriage did not violate the statute is plainly unsound as is also shown *supra*.

His secondary contention that the evidence received at the preliminary hearing did not show a corpus delicti (in the correct sense of the phrase) because incompetent evidence was received, overlooks the rule that the presence of such evidence does not invalidate an order holding defendant to answer where as here the record shows that there was sufficient competent evidence to warrant "assuming the possibility that an offense had been committed and the accused is guilty of it." (*Bompensiero, supra,* at p. 183.)

Examination of the transcript of the preliminary hearing reveals that Marilyn Carrico and Judy Breazeale and Sergeant Fred L. Mitchell, the only witnesses, testified substantially to the things that were later covered in the trial and that they made a showing which could scarcely fail to leave the magistrate with that robust suspicion which the *Bompensiero* and other cases hold to be sufficient to warrant the magistrate in binding defendant over to the superior court. " 'The fact that the trial judge feels, perhaps correctly, that the evidence in the grand jury transcript will not result in an ultimate conviction of the defendants can have no bearing upon his legal responsibility to uphold an indictment if, as is said in *Bompensiero* v. *Superior Court, supra,* at pages 183-184: ". . . there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." ' (*People* v. *Olf,* 195 Cal. App.2d 97, 103 [15 Cal.Rptr. 390].) " (*People* v. *Reed,* 202 Cal.App.2d 575, 582 [20 Cal.Rptr. 911].)

Also it is to be remembered that the requirement of corroboration has no application to a preliminary hearing. *People* v. *McRae,* 31 Cal.2d 184, 187 [187 P.2d 741]: "In restricting its prohibition to a conviction, section 1111 is in harmony with the principle that less evidence is required to support a determination of probable cause for a commitment than a determination of guilt for a conviction. It is settled that in determining that there is probable cause to hold a defendant, a magistrate is not bound by the rule that there must be no reasonable doubt as to the guilt of a defendant, and that he may commit a defendant, even though there may be doubt as to his guilt." See also *In re Schwitalla,* 36 Cal. App. 511 [172 P. 617]; *People* v. *Cron,* 207 Cal.App.2d 452,

456 [24 Cal.Rptr. 587]; *Kind* v. *Superior Court,* 143 Cal.
App.2d 100, 103 [299 P.2d 414]; *Stern* v. *Superior Court,*
78 Cal.App.2d 9, 17 [177 P.2d 308]; *In re Tannenbaum,* 115
Cal.App.2d 394 [252 P.2d 54]. There was no error
in denying the motion to set aside the information.

 One of the many complaints appellant makes about
rulings upon evidence pertains to the attempted impeachment
of defense witness Gerstein. He was called to bolster the
claim that appellant was to lend him some money on the
evening of the crimes in question. He testified on direct that
he arrived at appellant's office on that evening at about
8 to 8:30 for the purpose of having dinner with appellant
and receiving from him a loan of $500 to $600. There were
three women in the reception room when Gerstein arrived.
He and Dr. Singer were unable to dine together. On cross-
examination he said he was accompanied by a young woman
named Marilyn whose last name he could not recall but later
revealed as Levy; appellant told him to come back in a little
bit so he and Miss Levy took a little walk and returned
shortly. Then police arrived while they were in the office;
and both of them were interrogated by Lieutenant Brown.

On cross-examination the following occurred: "Q. And
when he interrogated you he was interested apparently,
wasn't he, in your reason for being at the doctor's office?
Just yes or no. A. Yes. Q. Didn't you tell him that you
had brought this girl Marilyn Levy to Dr. Singer's office for
the purposes of an abortion? A. No. Q. You never made
that statement? A. No." Counsel for appellant moved to
strike the answer as hearsay and the deputy district attorney
said: "If the Court please, I have to ask the question in
order to impeach the witness at a later time"; also, "I in-
tend to call Lt. Brown in rebuttal to testify that he did
have such a conversation with this witness, for the purpose
of impeaching the witness."

Lieutenant Brown was called in rebuttal and testified that
he conversed with Gerstein and Miss Levy. When he was
asked: "Did Mr. Gerstein tell you the purpose of his visit
to the office?" defendant's counsel objected and the prose-
cutor argued, "This is impeaching testimony with refer-
ence to Mr. Gerstein's testimony that he gave in this court,
that the purpose of his visit was to borrow money. When
Mr. Gerstein was on the stand I asked him, 'Did you not tell
Lt. Brown at that time and place that you brought Marilyn
Levy there for the purpose of getting her aborted?' This

was denied. . . . My point is, it is not to the truth of the matter asserted, but merely evidence of impeachment by prior inconsistent statement." The objection being overruled, the witness said: "He told me that he had brought Mrs. [sic] Levy there to have her aborted by Dr. Singer."

Counsel for appellant now argue that this was not proper impeachment and the questions were asked for the real purpose of placing before the jury improper and highly prejudicial testimony. They cite *People* v. *Perez*, 58 Cal.2d 229, 241 [23 Cal.Rptr. 569, 373 P.2d 617] to the effect that " ' [i]t was improper to ask questions which clearly suggested the existence of facts which would have been harmful to defendant, in the absence of a good faith belief by the prosecutor that the questions would be answered in the affirmative, or with a belief on his part that the facts could be proved, and a purpose to prove them, if their existence should be denied.' " Also, *People* v. *Grayson*, 172 Cal.App.2d 372, 376 [341 P.2d 820], which says: "A witness may not be cross-examined on matters which are irrelevant or outside the scope of direct examination for the purpose of testing the witness' credibility, nor may unrelated matters be brought out for the purpose of showing that the witness on other occasions made contradictory statements."

McCormick on Evidence, section 36, page 66: "[I]f the inquiry on cross-examination is as to inconsistent statements about 'collateral' matters, the cross-examiner must 'take the answer'—he cannot bring on other witnesses to prove the making of the alleged statement.

"At this latter stage, of extrinsic evidence, that is, the production of attacking witnesses, for obvious reasons of economy of time and attention, the range of impeachment by inconsistent statements is sharply narrowed. The tag, 'You cannot contradict as to collateral matters,' applies, and here the meaning is that to impeach by extrinsic proof of prior inconsistent statements, such statements must have as their subject (1) facts relevant to the issues in the cause, or (2) facts which are themselves provable by extrinsic evidence to discredit the witness." See also, McBaine, California Evidence Manual (2d ed.) section 428, page 131.

The test is whether the impeaching matter could be proved as a part of the offering party's affirmative case. Manifestly the fact that the witness had brought the woman to the doctor's office "to have her aborted by Dr. Singer" would not have been competent as a part of the prosecution's case.

The statement does not necessarily connote any arrangement with the doctor, but if it did it would not prove that that or any other abortion had been committed by him. It could not have higher status than mere preparation for an offense and mere preparation is not a crime. (*People* v. *Werner*, 16 Cal.2d 216, 221 [105 P.2d 927]; *People* v. *Buffum*, 40 Cal.2d 709, 718 [256 P.2d 317]; 14 Cal.Jur.2d § 28, p. 213.) Not being competent as proof of commission of other similar offenses, this evidence could have no probative effect at all. The record indicates that Lieutenant Brown was called only for the purpose of injecting into the hearing incompetent evidence for the purpose of prejudicing the defendant before the jury. The overruling of the objection was clear error, but the stream of other contradictory evidence, legitimately received, was so strong that it cannot be said that a miscarriage of justice resulted from this error.

Counsel for appellant did not despise such methods when pursued on behalf of their own client. They complain insistently about the limitation of the cross-examination of Sergeant Mitchell concerning the lapse of 11 days after arrest before filing of a complaint against appellant, whereas section 825, Penal Code, requires its filing within two days excluding Sundays and holidays. The professed objective of the cross-examination was to show that the sanitary napkins were not found inside the girls when examined by their doctors after leaving Singer's office (no one testified they had been placed there); that the rubber catheter "had been placed inside the girls after they were released by the police department," and that the delay was an intentional aid to building a fictitious charge against appellant. Each of the abortees testified that she had not placed the catheter inside her after she left Dr. Singer's office. There is nothing better than speculation and conjecture to back up the argument of appellant that some other person may have done so, and it is well settled that a mere possibility is not evidence. (*Sanders* v. *McFarlane's Candies*, 119 Cal.App.2d 497, 500 [259 P.2d 1010]; *Brocato* v. *Standard Oil Co.*, 164 Cal.App.2d 749, 758 [331 P.2d 111]; *Estate of Kuttler*, 185 Cal.App.2d 189, 204, 205 [8 Cal.Rptr. 160]; *Estate of Teed*, 112 Cal.App.2d 638, 644 [247 P.2d 54].) It does not appear probable that appellant's counsel had reasonable expectation of proving this suggested misconduct of the police or of doing more than reaping a favorable reaction in favor of appellant.

The situation falls within the above quotation from *People* v. *Perez, supra,* 58 Cal.2d 229, 241. This rule applies to the conduct of defense counsel as well as that of a prosecutor. Appellant's brief concedes that "the delay may not have affected his [appellant's] right to a fair trial." We are certain that defendant's "fundamental right" was not violated by the rulings and that they did not interfere with his having a fair trial.

Appellant claims error in denial of his motion for arrest of judgment but we find none in the ruling.[3] The claim is that the information does not allege the specific intention required by the statute, i.e., intent to procure a miscarriage, and impliedly that failure to demur does not bar the motion in arrest because the alleged defect in the pleading goes to the statement of facts constituting a public offense (Pen. Code, §§ 1004, 1012). The argument is misplaced because the complaint alleges the offense in the language of the statute (see footnote 1 *supra*), and that is enough (Pen. Code, § 952; 26 Cal.Jur.2d, § 38, pp. 494-495) ; this is true of abortion as well as other crimes (*People* v. *Guaragna,* 23 Cal.App. 120, 122 [137 P. 279]; *People* v. *Heddens,* 12 Cal.App.2d 245-246 [55 P.2d 230]; 1 Cal.Jur.2d § 19, p. 164). Indeed, this information specifically alleges in each case that defendant "did willfully, unlawfully and feloniously provide, supply, use and employ an instrument and other means upon the person of [the abortee] with the willful, unlawful and felonious intent then and there and thereby to procure the miscarriage of said [abortee]." As previously pointed out, actual pregnancy is not of the essence nor is a consummation of a miscarriage (1 Cal.Jur.2d §§ 11, 12, pp. 159-160). The attempt to produce a miscarriage constitutes the substantive offense. (*People* v. *Berger,* 131 Cal. App.2d 127, 129 [280 P.2d 136]; *People* v. *Wilkes,* 177 Cal. App.2d 691, 700-701 [2 Cal.Rptr. 594].) The language of the information at bar is, as previously indicated, a sufficient allegation of the felonious intent required by the statute (see

---

[3]Penal Code section 1185: "A motion in arrest of judgment is an application on the part of the defendant that no judgment be rendered on a plea, finding, or verdict of guilty, or on a finding or verdict against the defendant, on a plea of a former conviction, former acquittal or once in jeopardy. It may be founded on any of the defects in the accusatory pleading mentioned in section 1004, unless the objection has been waived by a failure to demur, and must be made and determined before the judgment is pronounced. When determined, the order must be entered in the minutes."

*Matter of Application of Ahart,* 172 Cal. 762, 765 [159 P. 160]; *Messick* v. *Superior Court,* 57 Cal.App. 340, 342 [207 P. 58]; *People* v. *Loeper,* 167 Cal.App.2d 29, 33 [334 P.2d 93]; 26 Cal.Jur.2d § 61, p. 532).

There was no error in denying the motion in arrest of judgment; nor is there any merit in the claim that the information is defective.

As a predicate for attacks upon rulings which received evidence as to the conduct of Mrs. Holzman or of things said and done by her to Judy and Marilyn, and similar rulings, counsel for appellant argue tthat there is no proof of conspiracy and hence the objection of hearsay should have been sustained. We find no merit in the contention.

11 California Jurisprudence 2d section 13, page 233: "It is not necessary that the parties should meet together and enter into an explicit or formal, or elaborate and detailed, written agreement to commit the crime. Nor is it necessary that the criminal enterprise in its inception contemplate a particular crime as against a particular person or as between particular persons. It is only necessary that each conspirator adopt a common design with the knowledge and consent of the others. And the agreement may result from actions of the defendants in carrying out a common purpose to achieve an unlawful end."

*People* v. *Califro,* 120 Cal.App.2d 504, 512 [261 P.2d 332]: "It is contended that as to Andrew and Lena there is no evidence of any agreement between them to commit abortions upon which a conspiracy could be predicated. There does not have to be direct evidence of such agreement—it may be inferred from other evidence—from the circumstances. Here the facts that the abortion arrangements were first made by the victims with Lena, and that following her instructions they were met by the aborter, constitute sufficient evidence from which such an agreement might reasonably be inferred."

*People* v. *Buono,* 191 Cal.App.2d 203, 215 [12 Cal.Rptr. 604]: " '. . . Any joint action on a material point or collocation of independent but conspiring acts by persons closely associated with each other, is held to be sufficient to enable the jury to infer concurrence of sentiment; and one competent witness will suffice to prove cooperation of an individual conspirator.' "

Without pausing to detail the various rulings thus attacked

we content ourselves with holding that the fact of conspiracy was amply established and is shown by the facts above narrated.

Only intolerable lengthening of this opinion would result from separate discussion of other points raised by appellant. We have examined them and find each to be without merit.

An appeal from an order denying a new trial does not lie in this case (Pen. Code, § 1237). The order denying motion made under Penal Code section 995 is not appealable (*People* v. *Simmons,* 119 Cal. 1, 2 [50 P. 844] ; *People* v. *Ketchel, supra,* 59 Cal.2d 503, 531; nor is an order denying motion for arrest of judgment (*People* v. *Mason,* 184 Cal. App.2d 317, 330 [7 Cal.Rptr. 627] ; *People* v. *Bechtel,* 41 Cal. 2d 441, 446 [260 P.2d 31] ). Those matters are reviewable and have been reviewed upon the appeal from the judgment.

Judgment affirmed; attempted appeals from said orders dismissed.

Fox, P. J., and Herndon, J., concurred.

A petition for a rehearing was denied July 23, 1963, and appellant's petition for a hearing by the Supreme Court was denied August 20, 1963.