Filed 10/29/20  P. v. Artykov CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>AZIZ ARTYKOV,<br><br>        Defendant and Appellant. | A154379<br><br><br>(Contra Costa County<br>Super. Ct. No. 05-171244-7) |

Defendant Aziz Artykov appeals from a judgment after a jury found him guilty of commercial bribery.  He argues that the conviction must be reversed on four grounds:  (1) the testimony of defendant's accomplice was not sufficiently corroborated; (2) the evidence was insufficient to support the jury's finding that the bribery involved more than $1,000; (3) the record lacks substantial evidence to support the jury's implied finding that the prosecution was timely; and (4) the trial court abused its discretion in admitting testimony that defendant had threatened a witness's children.  We will affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

The following is a brief summary of some of the trial evidence, which we set out to provide context to the claims raised on appeal.

In 2010, defendant moved into an apartment at the Avalon Walnut Creek housing complex (Avalon).  Avalon contains market rate apartments

1

but allocates 20 percent of its units to affordable housing for low-income residents. After these affordable apartments all became occupied, Avalon maintained a waitlist of applicants that was managed by Avalon employee Matthew McVicker. McVicker started as the customer service manager for Avalon in 2009 but was then promoted to community manager and oversaw the affordable housing program.

On July 13, 2017, a grand jury indicted defendant on one felony count of commercial bribery (Pen. Code, § 641.3, subd. (a)).[1] The indictment alleged that between September 1, 2013, and January 30, 2016, defendant unlawfully offered and gave more than $1,000 to McVicker. The indictment alleged that the offense was not discovered until April 2016, when McVicker confessed to internal Avalon auditors that he was accepting bribes. McVicker told the auditors that the bribes were related to his management of the affordable housing waitlist, and his employment was terminated by Avalon shortly thereafter.

At trial, McVicker testified as a witness for the prosecution under a plea agreement that reduced his felony bribery charge to a misdemeanor. McVicker testified that in 2010 or 2011, defendant began giving McVicker cash for certain services, such as use of the front copy and fax machines or setting up parking permits for defendant. McVicker testified that early on, defendant would give him "20 dollars" or "wine and candy" for the staff. Over time, defendant's requests evolved and the amount of cash increased. McVicker testified that starting in late 2010, defendant began inquiring about the affordable housing waitlist and the availability of those apartments at Avalon. He testified that defendant would then ask him to add certain

___

[1] Unless otherwise indicated, all further section references will be to the Penal Code.

2

people to the top of the waitlist. He testified that around 2013, this manipulation of the waitlist transitioned into bypassing the waitlist entirely: As an affordable apartment became available, defendant would provide McVicker with a name and that person would come into the leasing office, fill out an application, get approved, and then be able to move in. McVicker testified that defendant typically gave him "a hundred dollar bill" as payment and that the most defendant gave him at any one time was "a few 100 dollars." He testified that when the internal Avalon auditors interviewed him in April 2016, he told them that he accepted money from defendant "[p]robably like ten times."

The jury found defendant guilty of commercial bribery and that the value of the bribe was in excess of $1,000. The trial court sentenced defendant to five years of probation, with one year in custody to be served on home detention. This appeal followed.

## DISCUSSION

Defendant makes four arguments on appeal. First, he argues that the prosecution presented insufficient corroboration of McVicker's accomplice testimony to support defendant's conviction. Second, defendant argues that the evidence was insufficient to support the jury's finding that the amount involved in the bribery was more than $1,000. Third, he argues that the record lacks substantial evidence to support the jury's implied finding that the prosecution was timely. Fourth, defendant argues that the trial court abused its discretion in admitting testimony that he had threatened a witness's children. We address each argument in turn.

## I. CORROBORATION OF ACCOMPLICE TESTIMONY

Defendant argues first that his conviction should be reversed because the prosecution's evidence was insufficient to corroborate the testimony of his

3

accomplice, McVicker.  The People cite the testimony of two other Avalon residents, Elena Lopez and Alexandre Makeev, as sufficient corroborating evidence of McVicker's testimony.

### A. Additional Facts

At trial, Elena Lopez testified that she initially met defendant at a party and contacted him in 2012 to help two women find housing.  She testified that defendant offered the women two options at Avalon: (1) sublease an apartment for $300 below the market price and pay rent in cash directly to defendant; or (2) have Lopez complete a housing application with her own information so that the women could qualify for an affordable apartment, and pay defendant a $4,000–$6,000 fee depending on the size of the unit.  Lopez testified that she filled out an application but the women elected to sublease instead, so defendant told her he would destroy the application.  She testified, however, that defendant instead appeared to have submitted the application because Avalon subsequently contacted her with an available affordable apartment.  Lopez testified that she moved into the unit in early 2015, and a few days later defendant demanded that she pay him $6,000 based on the " 'deal' " they made when she gave him the application.  She testified that defendant told her the payment was not only for him but also for "somebody in the office who helped you."  She testified that she refused to give him the money, despite his repeated requests.

Alexandre Makeev testified that he was living in a one-bedroom affordable apartment at Avalon when he had a discussion with defendant about the possibility of moving into a bigger apartment.  He testified that defendant offered him two options for getting a three-bedroom apartment: (1) let defendant sublet it for two years to collect money and then move in; or

(2) pay defendant a $15,000 fee.  He testified that defendant explained that money needed to be collected "to pay somebody in the corporate . . . ."

## B. Analysis

The legal standards and principles regarding corroboration of accomplice testimony are well established.  Section 1111 provides:  "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."  Section 1111 does not affect the admissibility of accomplice testimony but rather reflects the Legislature's determination that " 'because of the reliability questions posed by' " accomplice testimony, such testimony " 'by itself is insufficient as a matter of law to support a conviction.' "  (*People v. Najera* (2008) 43 Cal.4th 1132, 1137, quoting *People v. Cuevas* (1995) 12 Cal.4th 252, 261.)

Corroboration evidence is thus sufficient "if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth."  (*People v. Fauber* (1992) 2 Cal.4th 792, 834.)  It may be established entirely by circumstantial evidence, or evidence that is " ' "slight and entitled to little consideration when standing alone . . . ." ' "  (*People v. Williams* (2013) 56 Cal.4th 630, 679, quoting *People v. Abilez* (2007) 41 Cal.4th 472, 505.)  " ' "The corroborating evidence need not by itself establish every element of the crime, but it must . . . tend to connect the defendant with the crime" ' " or " ' "implicate the defendant by relating to an act that is an element of the crime." ' "  (*Ibid.*)  " 'The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration.' "

5

(*People v. Romero and Self* (2015) 62 Cal.4th 1, 32, quoting *People v. Rissman* (1957) 154 Cal.App.2d 265, 278.)

Here, defendant argues that Lopez's and Makeev's testimony was not sufficiently corroborative of McVicker's accomplice testimony because it did not relate to any of the three elements of commercial bribery under section 641.3, subdivision (a): (1) that defendant gave money to an employee; (2) that defendant intended to injure or defraud Avalon; or (3) that McVicker accepted the money in return for using his position for the benefit of defendant.

First, defendant argues that neither Lopez nor Makeev testified that defendant gave cash to McVicker. Specifically, defendant argues that Makeev testified that defendant said he would use the $15,000 to " 'pay someone in corporate,' " but McVicker was not actually " 'in corporate . . . .' " We do not find this argument persuasive. As a preliminary matter, Lopez testified that defendant said he needed to pay "somebody in the office who helped you." In any event, the distinction that McVicker was employed in Avalon's front office and not its corporate division does not negate Makeev's testimony. Nor are we persuaded that testimony from either witness needed to identify McVicker by name. Given that corroboration evidence may be " ' "slight and entitled to little consideration when standing alone," ' " the testimony from both Lopez and Makeev tended to connect defendant to the first element of bribery: giving money to an employee of Avalon. (*People v. Williams*, *supra*, 56 Cal.4th at p. 679.)

Second, defendant argues that none of the testimony from Lopez and Makeev related to defendant's intent to injure or defraud Avalon. We find *People v. Bunyard* (1988) 45 Cal.3d 1189 (*Bunyard*) instructive on this point. In *Bunyard*, the defendant's accomplice testified at trial that he was hired to kill the defendant's wife. (*Id.* at p. 1201.) That accomplice testimony was

corroborated by another individual, who testified that the defendant had also solicited him on numerous occasions to kill the defendant's wife. (*Id.* at p. 1206.) The California Supreme Court concluded that this evidence was sufficient to corroborate the testimony of the accomplice, as it was "highly probative" of defendant's intent to kill his wife. (*Ibid.*) Here, Lopez and Makeev testified that defendant offered them affordable apartments in exchange for payments made directly to him. This testimony tended to connect defendant to the second element of bribery: intent to defraud Avalon by selecting individuals to move into affordable housing who were not eligible to do so, and by pocketing fees and rent money from those individuals.

Third, defendant argues that there was no corroborating testimony regarding the connection between defendant's payments and McVicker's use of his position for defendant's benefit. Specifically, defendant argues that neither Lopez nor Makeev testified that defendant "explained how he could obtain apartments for them." We again find *Bunyard* instructive, as the California Supreme Court concluded that the testimony regarding other solicitations was sufficient corroborating evidence because it demonstrated defendant's plan for killing his wife: "hiring a friend to do the actual physical killing at defendant's behest and direction . . . ." (*Bunyard*, *supra*, 45 Cal.3d at p. 1206.) Here, the testimony from Lopez and Makeev similarly evidenced defendant's bribery scheme. It showed that, for individuals seeking placement in Avalon's affordable housing apartments or for current residents wanting alternative units, defendant demanded either one-time payments or the ability to first sublet their apartments for a profit. Both Lopez and Makeev testified that defendant said he needed these payments in order to pay bribes to an Avalon employee. That testimony tended to connect defendant to the third element of bribery: that McVicker accepted bribes

7

from defendant in exchange for the ability to manipulate and bypass Avalon's affordable housing waitlist.

While corroborating evidence need not establish every element of the crime, the testimony of Lopez and Makeev implicated defendant by relating to acts involved in the three elements of commercial bribery. (*People v. Williams*, *supra*, 56 Cal.4th at p. 679.) In sum, we conclude that there was sufficient corroborating evidence to support McVicker's accomplice testimony.

## II.    JURY FINDING ON BRIBERY AMOUNT

Defendant also argues that his conviction should be reversed because the evidence was insufficient to support the jury's finding that the amount involved in the bribery was more than $1,000.

### A. Additional Facts

McVicker testified that early on in their relationship, defendant gave him small amounts of cash ("20 dollars") or staff gifts ("wine and candy") in exchange for use of front office equipment or handling defendant's parking issues. He testified that he considered those payments like "tips" but knew that accepting tips was against Avalon's ethics policy.

McVicker testified that the amount of the payments increased once defendant became involved in manipulating and bypassing the affordable housing waitlist. McVicker testified that defendant typically gave him "a hundred dollar bill." When asked for the highest amount that defendant paid him at any one time, McVicker testified that it was "a few 100 dollars." He testified that defendant always paid him in cash. He testified it was not his regular practice to deposit cash but any deposits of cash from defendant were done at an ATM in Brentwood.

McVicker testified that there were "five to seven" times that defendant gave him the name of a person to move in when an affordable apartment

became available.  When asked whether defendant made more than five to seven payments to him, McVicker answered, "Yes."  He testified that when the internal Avalon auditors interviewed him, he told them that he accepted money from defendant "[p]robably like ten times."  David Hutchins, one of the auditors, testified at trial that McVicker said he had accepted money from defendant "[a]round ten times."

Forensic accountant Ken Tam also testified at trial.  Tam testified that he examined McVicker's bank records and determined that from August 14, 2013, to June 13, 2016, there were 31 cash deposits made from the Brentwood ATM totaling $4,345.

### B. Analysis

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' "  (*Ibid.*, quoting *People v. Redmond* (1969) 71 Cal.2d 745, 755.)

Defendant argues McVicker's testimony was insufficient to establish the total amount of the bribes for two reasons.  First, he contends that the testimony "left the jury with no way to know how many times [defendant] gave McVicker money and how much he gave."

We disagree.  McVicker testified that when the internal Avalon auditors interviewed him, he told them that he accepted money from defendant "[p]robably like ten times."  Hutchins's testimony confirmed this statement.  McVicker testified that defendant typically gave him "a hundred dollar bill"

9

as payment. This testimony supports a reasonable deduction by the jury that defendant paid McVicker in excess of $1,000 in bribes: multiplying 10 payments by the typical $100 amount.

McVicker's testimony that defendant paid him smaller amounts ("20 dollars") early on does not change our conclusion, as McVicker also testified that defendant had once given him a few hundred dollars. Evidence that some amounts were more or less than $100 is consistent with the reasonable deduction that defendant's payments averaged $100. Similarly, McVicker's testimony confirming that defendant made *more* than five to seven payments is consistent with the reasonable deduction that defendant paid McVicker around 10 times.

Second, defendant cites *People v. Alkow* (1950) 97 Cal.App.2d 797 to support his position that the prosecution failed to provide "additional, easily obtained evidence" beyond McVicker's testimony: specifically, that Tam failed to review bank records with McVicker to confirm the source of the cash ATM deposits. We find the argument unpersuasive because, as discussed above, McVicker's testimony alone was sufficient evidence to support the jury's finding that the bribes exceeded $1,000. Moreover, *Alkow* is distinguishable because in that case, the prosecution failed to call available witnesses to testify regarding the details of the alleged embezzlement by an attorney for a corporate collection agency. (*Id.* at p. 802.) The appellate court concluded that without any testimony as to certain material facts (e.g., that defendant improperly issued corporate checks or that the checks did not bear the signatures of an authorized account holder), there was insufficient testimony to establish his guilt. (*Id.* at pp. 801–803.) Here, defendant does not point to any additional witness that the prosecution failed to call. And given McVicker's testimony that defendant did not pay him on any

10

predictable schedule and thus specific payments for specific tenants could not be discerned from his bank records, it is unclear what material facts would have been gleaned from Tam's review of those records with McVicker.

We thus conclude that there was sufficient evidence to support the jury's finding that the total amount of defendant's bribes to McVicker exceeded $1,000.

## III. TIMELINESS OF PROSECUTION

Defendant argues next that the record lacks substantial evidence to support the jury's implied finding that the prosecution was timely. Specifically, defendant argues that Avalon had constructive knowledge of the crime more than four years before the prosecution began. The People respond that this argument has been forfeited because defendant did not raise it at trial or, in the alternative, that substantial evidence supports the finding that the proceedings were brought in a timely manner. We do not find the forfeiture argument persuasive as the parties discussed the issue with the trial court and the jury was provided with an instruction regarding the statute of limitations. Accordingly, we turn to the merits of the argument.

### A. Additional Facts

McVicker testified that "it was probably in the year 2010 where we would see [defendant] giving what looked to be a tour of the property" and that "made us believe that the subletting was happening." He testified that he had witnessed people living in apartments that defendant was associated with who were not on the lease, and that mail would be delivered to the leasing office for an individual who was not named on the lease agreement. McVicker testified that another Avalon employee, Tiffany Trejo, brought up the subletting issue to defendant.

11

## B. Analysis

The statute of limitations for commercial bribery is four years "after discovery of the commission of the offense . . . ." (§ 801.5; see § 803, subd. (c).) "[L]ack of actual knowledge is not required to bring the 'discovery' provision of section 800 into play." (*People v. Zamora* (1976) 18 Cal.3d 538, 571 (*Zamora*).) "The crucial determination is whether law enforcement authorities or the victim had actual notice of circumstances sufficient to make them suspicious of fraud thereby leading them to make inquiries which might have revealed the fraud." (*Ibid.*, italics omitted.) But discovery of a loss, without the discovery of a criminal agency, is insufficient to trigger the statute of limitations. (*People v. Soni* (2005) 134 Cal.App.4th 1510, 1518.) "The question is whether there is sufficient knowledge that a crime has been committed." (*People v. Crossman* (1989) 210 Cal.App.3d 476, 481.)

The issues of when Avalon "actually learned of defendant's fraud and whether, through the exercise of reasonable diligence, it could have discovered the fraud earlier, presented questions for the jury to decide." (*People v. Petronella* (2013) 218 Cal.App.4th 945, 956.) "When an issue involving the statute of limitations has been tried, we review the record to determine whether substantial evidence supports the findings of the trier of fact." (*People v. Castillo* (2008) 168 Cal.App.4th 364, 369.)

Defendant argues that the record shows McVicker and other Avalon employees were aware of subletting by defendant as early as 2010, and he relies on *Zamora* to support his position that the subletting put Avalon on constructive notice of defendant's bribery scheme. We find *Zamora* distinguishable from the facts here. In that case, the defendants were indicted on conspiracy and grand theft charges in connection with a house fire that occurred in October 1968. (*Zamora, supra*, 18 Cal.3d at p. 542.)

12

Within days of the incident, the fire inspectors were convinced that the fire had been set for insurance purposes and knew the identity of the likely suspect. (*Id.* at p. 568.) The fire inspectors agreed that the police department would take over after this initial investigation, doing the follow-up investigation and reconciling all of the evidence. (*Ibid.*) The police investigator testified that he did nothing further with the case until he was approached by investigators from the district attorney's office in 1972. (*Id.* at p. 571.) The evidence demonstrated a failure by the police department to handle its portion of the investigation, allowing the investigation to stall despite knowledge about the details of the fire and known suspects. (*Id.* at p. 573.) The appellate court concluded that there was not substantial evidence to support the jury's implied findings that reasonable diligence was exercised to discover the fraud, and the charges were thus barred by the statute of limitations. (*Id.* at pp. 573–574.)

Here, any knowledge by McVicker or other Avalon employees that defendant was *subletting* apartments starting in 2010 does not constitute sufficient knowledge that defendant committed the crime of *bribery*. (*People v. Crossman*, *supra*, 210 Cal.App.3d at p. 481.) Indeed, defendant moved in limine to exclude from trial evidence of his engagement or involvement in subletting at Avalon because: "Such evidence is not relevant to the crime of Bribery." Defendant does not point to any testimony showing that Avalon had reason to suspect that defendant was paying bribes to McVicker in order to sublet apartments. Even if subletting violated Avalon policy, it was not the crime charged against defendant. Any discovery of defendant's subletting did not involve the discovery of defendant's bribery. (*People v. Soni*, *supra*, 134 Cal.App.4th at p. 1518.)

Instead, Hutchins testified that in April 2016, Avalon officers learned that there may be some impropriety involved in the affordable housing program, and then were made aware that defendant was paying bribes when McVicker was interviewed on April 7, 2016, and confessed. Accordingly, we conclude that substantial evidence supports the jury's implied finding that prosecution of this case began within the required time.

## IV. WITNESS TESTIMONY ON THREAT

Finally, defendant argues that the trial court abused its discretion in admitting Lopez's testimony that defendant made a threat against her children when she refused to pay him $6,000.

### A. Additional Facts

Defendant moved in limine to exclude from trial evidence that he threatened Lopez, on the grounds that it was "both irrelevant to the underlying charge and extremely prejudicial." The trial court held a hearing under Evidence Code section 402 on the issue (402 hearing). During the hearing, Lopez testified that defendant asked her if she was going to pay him $6,000. She testified that when she said no, defendant said, " 'Well, then see what's going to happen to your children.' " Lopez testified that she sent her children away the next day to live with their father. She testified that she did not want to testify because she was afraid defendant would take action against her and her children. After counsel presented argument, the trial court overruled the objection to Lopez's testimony regarding the threat. The trial court found that the testimony "has significant and very substantial probative value for two separate reasons." First, the testimony was "directly relevant to the charged crime" because evidence had already been presented that defendant's bribery scheme involved extortion of money from people whom he and McVicker had helped to advance or bypass the affordable

14

housing waitlist.  Second, the testimony was relevant to Lopez's bias or credibility as a witness, as "her whole demeanor to the extent to which she's nervous, her affect, the way she testifies is all influenced by the degree to which she is afraid to testify."

Lopez then testified in front of the jury that when she refused to pay defendant, defendant said, " 'Well, then see what's going to happen to your children.' "  Lopez testified that it was "terrifying" and that while she did not contact the police, she took her children to live with her ex-husband until she moved out of Avalon several months later.

During cross-examination, Lopez was questioned regarding her completion of the affordable housing application for the two women, her acceptance of an apartment despite not submitting the application herself, and her failure to be recertified as eligible for affordable housing at Avalon.  Lopez, a registered nurse, was also questioned regarding whether, prior to moving into Avalon, she had performed a procedure on defendant's wife or girlfriend without a medical license.

## B. Analysis

Defendant argues that the threat testimony was inadmissible for three reasons.  First, he argues that there was no need to explain Lopez's state of mind because she did not disclose any fear of defendant to the jury.  Defendant offers *People v. Lopez* (2018) 5 Cal.5th 339 as a comparison.[2]  In that case, the prosecutor asked if a witness was " 'nervous and afraid' " of the defendant, and the witness did not answer at first but then testified that she did not want to answer that question.  (*Id.* at p. 359.)  Here, defendant contends that Lopez "was not hesitant or fearful" but rather "assertive and indignant" when testifying in front of the jury.

_____

[2] No relation to witness Lopez.

We agree that *Lopez* supports the general principle that testimony regarding fear of retaliation by defendant is relevant to that witness's credibility and therefore admissible. (*People v. Lopez, supra*, 5 Cal.5th 339.) But courts have made clear that "[i]n determining whether the trial court abused its discretion, we must focus on what the court was made aware of at the time it ruled on the motion, not on evidence that came out or circumstances that took place during the trial." (*People v. Fruits* (2016) 247 Cal.App.4th 188, 208; see *People v. Harris* (2008) 43 Cal.4th 1269, 1289 [explaining that the court had "no way of anticipating" witness's later testimony that the threat did not affect him when it made its ruling].) " 'To do otherwise would require us to hold the trial court to an impossible standard.' " (*People v. Fruits*, at p. 208, quoting *People v. Hernandez* (1999) 71 Cal.App.4th 417, 425.) Here, Lopez testified at the 402 hearing that she was afraid to testify because she was afraid of defendant and his actions against her and her children. Regardless of how Lopez presented in front of the jury, the trial court correctly overruled defendant's objection based on the testimony it received at the time of its ruling.

Moreover, even if Lopez was "assertive" or "indignant" in front of the jury, the threat testimony was still relevant because it allowed the jury to more accurately assess her demeanor and affect. (See Evid. Code § 780 [a "jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing"].) Notably, defendant points to examples of Lopez's "angry" responses to questions on cross-examination. Courts have made clear that a trial court properly exercises its discretion to admit threat testimony on direct examination where the prosecution reasonably anticipates a defense attack on the credibility of that witness. (See *People v. Mendoza* (2011) 52

16

Cal.4th 1056.) Here, Lopez's involvement in the two women's affordable housing application and failure to be recertified for affordable housing signaled that the defense would challenge her credibility. Indeed, that is what happened: The record reflects that Lopez was cross-examined on these topics, as well as her involvement in a medical procedure with defendant's wife or girlfriend.

Second, defendant argues that the trial court erred in finding that the threat was relevant to defendant's bribery scheme, contending that "violence and threats of violence played no part in it." Without such relevance, defendant argues that the threat testimony was inadmissible character evidence under Evidence Code section 1101, subdivision (b) and was more prejudicial than probative. Again, we disagree. The prosecution presented evidence, including testimony from both Lopez and Makeev, that showed defendant demanded money from current or prospective residents in order to pay bribes to McVicker and be able to manipulate or bypass the waitlist. Lopez testified that when she refused defendant's demands for money, he threatened her children. Thus, we agree with the trial court that the threat testimony was directly relevant to defendant's bribery scheme.

Third, defendant argues that the trial court erred in failing to instruct the jury that the testimony was " 'limited strictly to the witness's state of mind, not for the truth of any answer the witness might give.' " We do not find the argument persuasive because, as discussed above, the testimony was relevant to both Lopez's credibility and defendant's bribery scheme.

In sum, we conclude that the trial court did not abuse its discretion in admitting Lopez's testimony regarding defendant's threat against her children. Having determined no evidentiary error, we also reject defendant's argument that the alleged error violated his due process rights. (See *People*

17

*v. Partida* (2005) 37 Cal.4th 428, 437 ["If the reviewing court finds error, it must also decide the consequences of that error, including, if the defendant makes the argument, whether the error was so serious as to violate due process"].)

## DISPOSITION

The judgment is affirmed.

_____

Jackson, J.


WE CONCUR:


_____

Fujisaki, Acting P. J.


_____

Petrou, J.


A154379/*People v. Aziz Artykov*

19